UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| REPUBLIC OF TURKEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CHRISTIE'S INC. and | ) | |
| MICHAEL STEINHARDT, | ) | |
| | ) | |
| Defendants, | ) | CIV. ACT. NO.  17-cv-3086 (AJN) |
| | ) | |
| ANATOLIAN MARBLE | ) | |
| FEMALE IDOL OF KILIYA | ) | ORAL ARGUMENT REQUESTED |
| TYPE, | ) | |
| | ) | |
| Defendant-in-rem, | ) | |
| | ) | |
| JOHN POE, | ) | |
| | ) | |
| Intervenor. | ) | |

CHRISTIE'S INC.'S AND MICHAEL STEINHARDT'S MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED
COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)

THOMAS R. KLINE
CULTURAL HERITAGE PARTNERS, PLLC
1271 Avenue of the Americas, 43rd Floor
New York, NY 10020
tom@culturalheritagepartners.com

L. EDEN BURGESS
CULTURAL HERITAGE PARTNERS, PLLC
2101 L Street NW, Suite 800
Washington, DC 20037
eden@culturalheritagepartners.com

202-567-7594 Telephone
866-875-6492 Facsimile

*Attorneys for Defendants Christie's Inc. and Michael Steinhardt*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES………………………………………………...…………………ii

PRELIMINARY STATEMENT ...................................................................................................1

FACTUAL BACKGROUND.........................................................................................................3

    A.   Turkey Claims It Did Not Know where the Figure Was Located until March 2017. ......4

    B.   The Figure was Part of the Guennol Collection. ............................................................5

    C.   Turkey Knew in 1996-97 that the Figure Was Part of the Guennol Collection in New York. ...............................................................................................................................6

    D.   Turkey Has a Long History With the Met, Including Litigation Over the Lydian Hoard.. ...........................................................................................................................................8

    E.   The Journalist Who Found the Lydian Hoard Also Wrote about the Guennol Stargazer.. ...........................................................................................................................................8

    F.   The Guennol Stargazer Was Exhibited at the Met Regularly for 50 Years, Where the Guennol Provenance Was Referenced..........................................................................10

ARGUMENT..............................................................................................................................11

  I.   PLAINTIFF'S DELAY OF MORE THAN TWENTY YEARS IN MAKING A KNOWN CLAIM IS UNREASONABLE.............................................................................................12

    A.   Turkey's Claims Must Be Dismissed Under the Legal Standards Applicable to a Statute of Limitations Defense. ..................................................................................................12

    B.   The Court May Take Judicial Notice of the Materials Submitted Herewith.................13

    C.   Turkey Has Had the Information It Needed to Claim the Figure for Over 20 Years.....14

  II.   PLAINTIFF'S DELAY OF MORE THAN FIFTY YEARS VIOLATES THE DOCTRINE OF LACHES. ..................................................................................................15

    A.   Legal Standards Applicable to the Laches Doctrine Weigh in Favor of Dismissal. ......15

    B.   Turkey Unreasonably Delayed Making its Claim to the Figure....................................17

    C.   Turkey's Delay Prejudiced Defendants. ......................................................................18

    D.   Dismissal on the Grounds of Laches is Appropriate. ...................................................20

CONCLUSION............................................................................................................................21

# TABLE OF AUTHORITIES

## CASES

*Andrews v. Blick Art Materials, LLC,* 2017 U.S. Dist. LEXIS 121007
(E.D.N.Y. July 31, 2017) ................................................................................................14

*Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51 (2d Cir. 2016) ..........................14

*Associated Fin. Corp. v. Kleckner*, 480 F. App'x 89 (2d Cir. 2012) ..............................11

*Bakalar v. Vavra*, 819 F. Supp. 2d 293 (S.D.N.Y. 2011) .............................16, 17, 20, 23

*Detroit Institute of Art v. Ullim*, No. 06-10333, 2007 WL 1016996
(E.D. Mich. Mar. 31, 2007) ............................................................................................22

*Enron Corp. v. Springfield Assocs., L.L.C*, 379 B.R. 425 (S.D.N.Y. 2007) .................14

*Goodman v. McDonnell Douglas Corp.*, 606 F.2d 800 (8th Cir. 1979) ........................21

*Greek Orthodox Patriarchate v. Christie's, Inc.,* No. 98 Civ. 7664 (KMW),
1999 WL 673347 (S.D.N.Y. Aug. 30, 1999) .................................................16, 17, 20

*Halebian v. Berv.*, 644 F.3d 122 (2d Cir. 2011) .............................................................13

*Heide v. Glidden Buick Corp.,* 188 Misc. 198, 67 N.Y.S.2d 905
(App. Div. 1st Dep't 1947) ...............................................................................................3, 12

*Ikelionwu v. United States*, 150 F.3d 233 (2d Cir. 1998) ..............................................16

*In re Flamenbaum,* 1 N.E.3d 782 (N.Y. 2013) ...............................................................18

*Johnston v. Standard Mining Co.*, 148 U.S. 360 (1893) ................................................19

*Koch v. Christie's Int'l PLC*, 785 F. Supp. 2d 105 (S.D.N.Y. 2011),
*aff'd*, 699 F.3d 141 (2d Cir. 2012) ..................................................................................17

*Matter of Peters*, 34 A.D.3d 29 (App. Div. 1st Dept. 2006) ..........................................21

*Museum of Fine Arts, Boston v. Seger-Thomschitz,* 623 F.3d 1 (1st Cir. 2010) ..........22

*Orkin v. Taylor*, 487 F.3d 734 (9th Cir.  2007) .............................................................22

*People v. Chico*, 90 N.Y.2d 585, 687 N.E.2d 1288, 665 N.Y.S.2d 5 (1997) ...............14

*Robins Island Pres. Fund, Inc. v. Southold Dev. Corp.*, 959 F.2d 409 (2d Cir. 1992) ............16, 20

*Sanchez v. Tr. of Univ. of Pa.*, No. 04 Civ. 1253 (JSR), 2005 WL 94847
(S.D.N.Y. Jan. 18, 2004) ...........................................................................................16, 20

*Solomon R. Guggenheim Found. v. Lubell*, 77 N.Y.2d 311,
567 N.Y.S.2d 623, 569 N.E.2d 426 (1991) .....................................................2, 12, 13, 15, 17

*SongByrd, Inc. v. Estate of Grossman*, 206 F.3d 172 (2d Cir. 2000) ...........................12

*Sotheby's v. Shene*, No. 04 Civ. 10067 (TPG), 2009 WL 762697 (S.D.N.Y. Mar. 23, 2009 .......18

*Spanierman Gallery Profit Sharing Plan v. Merritt*, 2004 U.S. Dist. LEXIS 15609,

(S.D.N.Y. Aug. 9, 2004)...................................................................................................12

*Toledo Museum of Art v. Ullin*, 477 F. Supp. 2d 802 (N.D. Ohio 2006)....................................22

*Vineberg v. Bissonnette*, 548 F.3d 50 (1st Cir. 2008).................................................................18

## STATUTES

C.P.L.R. § 214(3)...........................................................................................................12

## OTHER AUTHORITIES

Ö. Acar and M. Rose, "Turkey's War on the Illicit Antiquities Trade," Archaeology,
   vol. 48, no. 2 (1995)..............................................................................................9

Sharon Waxman, Loot: The Battle over the Stolen Treasures of the Ancient World 147 (2008)...9

## RULES

Fed. R. Civ. P. 12(b)(6) ...........................................................................1, 11, 13, 14

Fed. R. Evid. 201(b)(2)...........................................................................................13

Fed. R. Evid. 201(c)(2)...........................................................................................13

Fed. R. Evid. 801(d)(2)...........................................................................................14

Defendants Christie's Inc. ("Christie's") and Michael Steinhardt ("Steinhardt"), by their undersigned counsel, state as follows in support of their Motion to Dismiss Plaintiff's Second Amended Complaint ("Compl.") pursuant to Fed. R. Civ. P. 12(b)(6).

## PRELIMINARY STATEMENT

Turkey premises its case on the assertion that it did not know and could not reasonably have known where to find the rare and valuable Kiliya-type marble idol at issue ("Figure" or "Guennol Stargazer") until being "alerted [in March 2017] that the Idol was in the possession of Christie's, and that Christie's intended to include the Idol in its Auction." Dkt #65, *Compl.* ¶ 30.[1] Documents recently unearthed by Defendants reveal that claim to be unfounded; Turkey knew the Guennol Stargazer was in New York by 1997 – *twenty years ago* – and possibly earlier, and had all the information it needed to make a claim of ownership or, at the very least, to inquire.[2] Based on the knowledge Turkey had, its claims are barred by the statute of limitations or laches.

Defendants have already raised the issue of whether Turkey should have been able to locate the Figure over the five decades in which it was published more than eight times and displayed for lengthy periods at the Metropolitan Museum of New York (the "Met"). In response, Turkey has argued that it cannot reasonably be expected to find every stolen object and surely could not have found the Figure. *See, e.g.,* Dkt #18, *TRO Tr.* at 18:2-5.

Turkey's contention is demonstrably false. Defendants recently discovered that from 1995 to 1997, Plaintiff's Ministry of Culture, General Directorate of Monuments and Museums, and at least some of the people working with the Directorate, learned about the presence of the

---

[1] In the Exceptional Sale catalog, Christie's described the Figure as coming from the well-known Guennol Collection of Edith and Alastair Bradley Martin. *Compl.* ¶ 29; Dkt #38-1, *Declaration of G. Max Bernheimer,* June 9, 2017 ("Bernheimer Decl."), Ex. A at 7.

[2] As detailed below and in the attached Declaration, research by Dr. Jennifer Morris located seven new publications, including five in Turkish and three published by Plaintiff's Ministry of Culture. *See Declaration of Jennifer A. Morris*, Aug. 17, 2017 ("Morris Decl."), Exs. B-H.

Guennol Stargazer in New York, held symposium presentations about it, and issued publications on the subject.

In 1995 and 1996, Rafet Dinç, Turkey's leading expert on Kiliya-type idols, attended two annual Ministry-hosted symposia, and in both instances subsequently published articles in Ministry-produced volumes (in 1996 and 1997, respectively) summarizing his symposia presentations. In his discussion of Kiliya-type idols in the 1997 publication, Dinç refers to the Guennol Collection *by name*, saying it is "known" that "an idol of 'Kiliya Type'" is in the "Guennol collection[] in New York." *Morris Decl.* Ex. C at p. 261. Even with this knowledge, Turkey took no action.

Plaintiff, having waited more than twenty years after it knew the Figure was in the possession of the Guennol Collection – information that would easily have led it to the Met, where the Figure was regularly on display for decades, and had been included in a well-publicized exhibition and accompanying catalogue both entitled "The Guennol Collection" (*see* Dkt #38, *Bernheimer Decl.* ¶ 8) – delayed unreasonably in bringing its claim, now barred by New York's statute of limitations. Additionally, the twenty-year period during which Turkey *actually* knew where to find the Figure colors the fifty-year period in which Turkey could readily have found it at the Met or in various publications, but claims it was too onerous to do so.

While delay in pursuing a claim is generally considered in the context of laches under New York law, it has long been the law of this state that "the true owner, having discovered the location of its lost property, cannot unreasonably delay making demand upon the person in possession of that property." *Solomon R. Guggenheim Found. v. Lubell*, 77 N.Y.2d 311, 319, 567 N.Y.S.2d 623, 627, 569 N.E.2d 426, 430 (1991), *citing Heide v. Glidden Buick Corp.,* 188 Misc.

198, 67 N.Y.S.2d 905 (App. Div. 1st Dep't 1947). Accordingly, Defendants ask that Plaintiff's claims be dismissed under either the statute of limitations or the doctrine of laches.

## FACTUAL BACKGROUND

The Guennol Stargazer is a work of art dating to approximately 3000 to 2200 BC. Turkey's Second Amended Complaint ("Complaint" or "Compl.") describes the Figure as "an extremely rare artifact that is an integral and invaluable part of the artistic and cultural patrimony of the people of Turkey." Dkt #65, *Compl.* ¶ 3.

The known provenance of the Figure goes back more than five decades, including a lengthy history of exhibitions at the Met and publications in the U.S., Germany, and, as now known, Turkey. *See* Dkt #38, *Bernheimer Decl.* ¶¶ 8, 10, 23-25; *Morris Decl.* Exs. A-F, H. The earliest provenance information currently available dates back to 1961, when Edith and Alastair Bradley Martin appear to have purchased the Figure and made it part of their widely known and respected Guennol Collection in New York. *See* Dkt #38, *Bernheimer Decl.* ¶¶ 4, 24. They then loaned it to the Met, which exhibited it repeatedly between 1968 and 1993. After being sold to Defendant Michael Steinhardt in 1993, the Figure was again loaned to the Met and exhibited in its permanent galleries from 1999 to 2007, including in the highly popular "Art of the First Cities in the Third Millennium B.C." exhibition from May 8 to August 17, 2003. Dkt #38, *Bernheimer Decl.* ¶¶ 8, 10, 23, 25.

The Figure has been extensively published, as well, with multiple references dating back to at least 1964. Dkt #38, *Bernheimer Decl.* ¶¶ 8, 23 & Exs. C-F, K-N. To the eight publication references cited in the Bernheimer Declaration (Dkt #38), Defendants can now add two newly discovered references to the Guennol Stargazer: the 1997 symposium volume published by the Turkish Ministry of Culture, and a 1989 Turkish newspaper article by cultural journalist Özgen

Acar. *Morris Decl.* Exs. C, F. The Figure thus has a decades-long history of being in a prominent New York collection and extensively published and exhibited at the Met, including six years during which Turkey was suing the Met for the return of the Lydian Hoard, yet Turkey claims it was unreasonable to expect it to find the Guennol Stargazer. Newly discovered evidence now establishes that Turkey did, in fact, locate the possessor of the Guennol Stargazer back in the 1990s, or perhaps earlier.

**A.  Turkey Claims It Did Not Know where the Figure Was Located until March 2017.**

Throughout the course of this litigation, Plaintiff has repeatedly stated or implied that Turkey did not know and could not have determined the location of the Figure until shortly before its Consul General made a claim on Christie's. Dkt #65, *Compl.* ¶ 3 (Plaintiff "alerted" to Christie's possession). Notably, Sedat Gonulluoglu, a counselor in Plaintiff's Culture and Tourism Office, stated in his TRO declaration, "Because these artworks [that is, those illegally excavated and removed from Turkey] are not from excavation sites with proper Government permits or declared to the proper authorities when they are found, the Turkish Government is often unaware that they have been found and removed from the country." Dkt #8, *Gonulluoglu Decl.* ¶ 4. *See also* Dkt #9, *Talaakar Decl.* ¶ 6 ("It is very difficult to locate the stolen objects when they are removed in this illicit fashion."). In his declaration in support of Plaintiff's PI Motion, Dr. Candemir Zoroglu of the General Directorate of Monuments and Museums echoed this point, stating: "When the Republic does identify cultural property that has been illegal[ly] excavated and removed from the country, the government takes appropriate steps to recover that property." *Id.* ¶ 27. *See also id.* ¶ 22 ("I understand that Christie's has criticized the Republic for not bringing a lawsuit to recover the Idol earlier. This criticism is unfair.").

In the same vein, in response to a Court inquiry at the TRO hearing about the timeliness of Turkey's claim and Christie's laches defense (Dkt #18, *TRO Tr.* at 16:14), Plaintiff's counsel first blamed the Met for failing to disclose that it had possession of the Figure (*id.* at 17:3-20 (Mr. Kaye)).[3] Counsel then argued:

> But the fact is to suggest that Turkey has to know about every single thing that happens in the world I think is wrong. I think the fact is here *when they learned about it, they moved against it….*
>
> ***
>
> [W]hen the Republic of Turkey is notified or finds out about, in any other way, the fact that its cultural patrimony is being sold or attempted to be sold on the market, it does what it has to do to try to -- to prevent its patrimony from going to the marketplace.

*Id.* at 18:2-5, 20:8-12 (Mr. Kaye) (emphasis added).

Turkey, protesting that it "does diligently search for it's [*sic*] looted antiquities" (Dkt #18, *TRO Tr.* 16:17-18), calls Defendants' claim of fifty years of delay mere "hyperbole" and asserts that Defendants' allegation is "designed to create the false impression that the Republic knew it had a claim to the Idol since 1967." Dkt #40, *Pltf PI Reply* at 7. It could not be clearer, however, that Plaintiff has wanted the Court and Defendants to accept that it had not found the Figure before March 2017 and could not reasonably have been expected to do so.

## B.  The Figure was Part of the Guennol Collection.

From about 1961 until 1993, the Figure was part of the Guennol Collection and on display at the Met where it was described as such. Dkt #38, *Bernheimer Decl.* ¶ 8, Ex. D. The Guennol Collection has been well-publicized for more than sixty years, including in international journals. As early as 1950, the Guennol Collection was mentioned in the *Journal of The*

---

[3] Turkey now admits that this slight on the Met was baseless because the Met dutifully objected to Turkey's overbroad discovery of unrelated events. Dkt #40, *Pltf PI Reply* at 8 n.10.

*American Oriental Society* because the famous Guennol Lioness was then on loan to the Brooklyn Museum. An essay in *Art Bulletin* that same year depicts and describes a Roman bronze from the Guennol Collection, mentioning that it was on loan to the Met. In 1969, Thomas Hoving, then-Director of the Met, published an article in the *Met Bulletin* describing the Guennol Collection and its affiliation with the Met. In fact, soon thereafter, the Figure was part of a Met exhibition and referenced in the accompanying catalogue, both entitled "The Guennol Collection." *The Guennol Collection,* The Metropolitan Museum of Art (New York, 1975 and 1982). *Morris Decl.* Exs. I-M. After Defendant Steinhardt acquired the Figure in 1993, he loaned it to the Met from 1999 to 2007, which exhibited it for most of that time, still as the Guennol Stargazer. Dkt #38, *Bernheimer Decl.* ¶ 25.

**C. Turkey Knew in 1996-97 that the Figure Was Part of the Guennol Collection in New York.**

It is now clear that Turkey's Ministry of Culture knew that the Figure was in the Guennol Collection in New York as early as 1996-97 and possibly earlier.

By way of background, the Turkish Ministry of Culture (under the auspices of its Directorate General of Monuments and Museums) hosts annual Archaeological Survey Symposia. Proceedings from the yearly symposia are subsequently published in sequential volumes, and appear to be among the leading sources for information about current archaeological issues in Turkey. *See Morris Decl.* Exs. B-D. In 1995 and 1996, among the symposia attendees was Rafet Dinç of Adnan Menderes University (Ex. B, p. 11; Ex. C, p. 255). Dinç has long been involved in researching Kiliya-type idols, and he in fact participated in the state-sponsored excavations in 1994 that Turkey claims revealed the workshop and findspot for the Figure. *See Zoroglu Decl.* ¶ 11. Far from being a stranger to Plaintiff's Ministry of Culture, Plaintiff identifies Dinç as having knowledge of "The likely location where the Idol was found."

Plaintiff's Initial & First Amended Disclosures at 4 (*Morris Decl.* Exs. P-Q). *See also* Plaintiff's Answers to Christie's Interrogatories (*id.* Ex. R at 6). From approximately 1986 to 1993, Dinç worked as a curator at the state-owned Manisa Museum. *See* Turkish Ministry of Culture and Tourism's website (available at: http://www.kultur.gov.tr/EN,113981/manisa-museum.html, accessed on Aug. 12, 2017). He has continued to be involved with Ministry-sponsored excavations, conferences, and publications.

In his May 1997 article in the Ministry's book summarizing the 1996 symposium, Dinç referred to the Guennol Collection *by name*, stating that it is "known" that "an idol of 'Kiliya Type'" is in the "Guennol collection[] in New York." *Morris Decl.* Ex. C at 261. Dinç also cited a 1992 article by German archaeologist Jürgen Seeher in which Seeher not only identifies the Figure as "Guennol Collection, New York" (*Morris Decl.* Ex. N at 161-22, nr. 28), but also *includes two photographs of the Guennol Stargazer* (*id.* at 154, fig. 1 & 161-22, nr. 28). Likewise, in the previous year's article covering the Ministry's 1995 symposium, and in a self-published abbreviated version of the same research, Dinç cited the same 1992 Seeher article (*Morris Decl.* Ex. B at 26, fn. 35; Ex. E at 91, fn. 4).

More recently, a Ministry of Culture publication from 2001 includes an article by Turan Takaoğlu, professor in the Department of Archaeology at Çanakkale Onsekiz Mart Üniversitesi in the Dardanelles, in which he described two excavations conducted under Dinç's supervision in 1994-95, cited both of Dinç's earlier Ministry articles, and thanked Dinç and the Directorate of Museums for their support. Takaoğlu also cited, once again, the 1992 Seeher article that identified the Guennol Stargazer by name. *Morris Decl.* Ex. D at 157, fn. 2; 160, fn. 6. These newly discovered materials, not previously mentioned by Turkey but found on the Ministry's

website by Defendants (*Morris Decl.* ¶¶ 4-6), contradict representations by Turkey that it lacked knowledge of the Figure's whereabouts.

**D. Turkey Has a Long History with the Met, Including Lengthy Litigation Over the Lydian Hoard.**

From 1987 to 1993, Turkey pursued a claim against the Met for return of the Lydian Hoard. During that time, the Guennol Stargazer was exhibited at and published by the Met. In the middle of this period, in 1989, Turkish cultural journalist Özgen Acar, who had moved to New York and was reporting on the litigation, located the Guennol Stargazer and published an article about it in a prominent Turkish newspaper. *Morris Decl.* Ex. F. Turkey admits that it has been heavily involved with the Met since it began litigation over the Lydian Hoard, but has not been able to explain why it could not find the Guennol Stargazer during the fifty years it was exhibited at the Met when a simple walk through the galleries would have revealed it. Nor does it appear that Turkey did anything to follow up on the Met's objections to Turkey's attempted discovery of other objects. Dkt #40, *Pltf PI Reply* at 8 n.10.

**E. The Journalist Who Found the Lydian Hoard Also Wrote about the Guennol Stargazer.**

The information about the Figure being sold at Christie's allegedly came to Plaintiff in an April 2017 newspaper article written by Acar,[4] and also *via* a March 2017 email from an unnamed Turkish reporter. Dkt #29, *Zoroglu Decl.* ¶ 16. While Plaintiff has declined to identify the reporter who sent the email, Turkey has acknowledged that the "Lydian Hoard case was brought to the attention of the government by the same author who wrote the article on this piece

---

[4] On April 19, 2017, Acar reported in Hurriyet Daily News that "The 'Kilia Idol,' a 23-centimeter statuette that has been smuggled from Turkey, will be auctioned on April 28 at New York Christies at an estimated price of $3 million." *Ancient Anatolian statuette of abundance seeks record at New York auction*, http://www.hurriyetdailynews.com/ancient-anatolian-statuette-of-abundance-seeks-record-at-new-york-auction-.aspx?PageID=238&NID=112157&NewsCatID=375, accessed on Aug. 13, 2017.

[the Guennol Stargazer] just now, even though that was 35 years ago." Dkt #18, *TRO Tr.* 16:11-13 (Mr. Kaye). Acar previously investigated the Lydian Hoard case, visited the Met several times in the early 1980s in connection with the Lydian Hoard case, and moved to New York at that time. Sharon Waxman, *Loot: The Battle over the Stolen Treasures of the Ancient World* 147 (2008). *Morris Decl.* Ex. O.

Acar revealed in *Archaeology* magazine in 1995 that Turkey knew about an exhibition at the Met and the accompanying book entitled "Glories of the Past," which referenced not only the Weary Herakles – a statute over which Turkey engaged in a protracted struggle with the Boston Museum of Fine Arts – but also the Figure:

> In 1980 Jale Inan, director of excavations at the ancient city of Perge, northeast of Antalya, heard rumors that something important had been stolen from the site. Later that summer, … Inan discovered the bottom half of the Herakles statue…. By 1981 the top half of the Herakles had been acquired by [Leon] Levy, who gave a half-interest in the sculpture to the Boston museum. *The statue was displayed at the Metropolitan from late 1990 through early 1991 in an exhibition of* [Shelby] *White and Levy's collection titled Glories of the Past. Turkey learned of the Levy-White Herakles from the exhibition catalogue...* and from a photograph that was faxed to the Antalya Museum.

Ö. Acar and M. Rose, "Turkey's War on the Illicit Antiquities Trade," *Archaeology*, vol. 48, no. 2 (1995), p. 48 (emphasis added) (*Morris Decl.* Ex. G). The book lists the Guennol Stargazer as being part of the Guennol Collection at the Met, and even gives the loan number. Dkt #38-5, *Bernheimer Decl.* Ex. E at 9. Dr. Zoroglu, one of Plaintiff's own declarants (Dkt #29), confirmed the Ministry's familiarity with "Glories of the Past" and with Acar's reporting. *Morris Decl.* Ex. H, pp. 144-45. Nevertheless, Turkey has yet to explain how Acar was able to find the Figure – first in 1989 and again in 2017 – when the Republic could not.

**F. The Guennol Stargazer Was Exhibited at the Met Regularly for 50 Years, Where the Guennol Provenance Was Referenced.**

Turkey has no explanation for failing to locate the Guennol Stargazer at the Met where it was on exhibit for five decades. The Met is one of the world's leading museums and has been well-known to Plaintiff as an antiquities-collecting museum. While Turkey pursued return of the Lydian Hoard from the Met between 1987 and 1993, the Met was exhibiting the Figure. During that litigation, Acar wrote about the Guennol Stargazer in a Turkish newspaper. *Morris Decl.* Ex. F. The simultaneity of events concerning the Met's exhibition of the Guennol Stargazer, the publications about it, and the Lydian Hoard litigation are displayed on a demonstrative timeline attached hereto. *Declaration of L. Eden Burgess*, Aug. 25, 2017 ("Burgess Decl."), Ex. A. Turkey was or could have been aware of all these events, yet there is no indication that Turkey acted on any of this information, even though Plaintiff certainly suspected that the Met may have acquired other objects that Turkey wished to claim (Dkt #18, *TRO Tr.* at 17:3-11 (Mr. Kaye) ("we submitted interrogatories where we asked for every object in the museum that came from Turkey")).

The crux of Defendants' Motion is this: at around the same time that Turkey was holding symposia on Turkish archaeology – attended by its leading expert on Kiliya-type idols, who identified the Figure in the Ministry's 1997 symposium publication as "known" to be in the Guennol Collection in New York – the Met was exhibiting and publishing the Figure, likewise unequivocally describing it as part of the Guennol Collection. In the meantime, Turkey was litigating its claim to the Lydian Hoard against the Met, and Acar, who had earlier published an article in a Turkish newspaper referencing the Guennol "Kilya" idol by name, was regularly visiting the Met and reporting on the Lydian Hoard case. *Burgess Decl.* Ex. A. Against this astonishing backdrop, which contradicts Plaintiff's numerous and highly specific representations

that it did not know where to find the Figure or how to claim it, it is strikingly clear that Turkey has known about the Figure for over twenty years, yet did not move against it until it appeared at Christie's and Acar publicly urged the Ministry to take action.[5] Turkey's position that it can tarry for fifty years in finding an eminently findable object, and also delay for twenty years in making a known claim, is extreme, unreasonable, and beyond the laws of New York.

Since Turkey's Ministry of Culture and several of its Directorate employees, as well as certain Turkish professors and a key reporter, knew of the Figure's importance and its location in the Guennol Collection, Plaintiff should have claimed the Figure soon after 1997, at the very latest. Plaintiff's utter failure to do so within a reasonable time makes resolution of this case straightforward: Turkey's claims should be dismissed.

## ARGUMENT

Dismissal is called for, given the newly discovered evidence of Ministry of Culture symposia and publications in 1996, 1997, and 2001 admitting knowledge of the location and possessor of the Guennol Stargazer, and also in light of Acar's 1989 Turkish newspaper article about the Figure. "Dismissal under Federal Rule of Civil Procedure 12(b)(6) is appropriate when 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.'" *Associated Fin. Corp. v. Kleckner*, 480 F. App'x 89, 90 (2d Cir. 2012) (summary order), *quoting Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 86 (2d Cir. 2000). Manifestly, that is the case here.

---

[5] "The Culture and Tourism Ministry now has an important mission: Archaeological excavations should be initiated in Kulaksızlar as soon as possible. I also wonder if the ministry can take action and stop the April 28 auction in New York." Ö. Acar, Hurriet Daily News, *supra* p. 7.

I.   **PLAINTIFF'S DELAY OF MORE THAN TWENTY YEARS IN MAKING A KNOWN CLAIM IS UNREASONABLE.**

   A.   **Turkey's Claims Must Be Dismissed Under the Legal Standards Applicable to a Statute of Limitations Defense.**

New York law is straightforward: an action to recover a chattel must be brought within three years of demand and refusal, and an owner, having discovered the location of allegedly stolen property, cannot unreasonably delay making a demand. C.P.L.R. § 214(3); *Lubell*, 77 N.Y.2d at 319, 567 N.Y.S.2d at 627, 569 N.E.2d at 430; *Spanierman Gallery Profit Sharing Plan v. Merritt*, 2004 U.S. Dist. LEXIS 15609, at *19 n.7 (S.D.N.Y. Aug. 9, 2004) (owner must "bring a replevin claim without 'unreasonable delay' upon learning where the property is located"). While no definitive rule has been established, courts have held that delays of fifteen years and seven years are unreasonable. *Heide*, 188 Misc. at 199 (reversing denial of summary judgment due to fifteen-year delay between contract and demand; "The demand which is necessary to start the running of the Statute of Limitations must be made within a reasonable time."); *SongByrd, Inc. v. Estate of Grossman*, 206 F.3d 172, 183 (2d Cir. 2000) (case time-barred by statute of limitations due to seven-year delay between knowledge of breach and demand; "plaintiff may not unreasonably delay in making a demand for property whose location is known").

Through the Ministry of Culture's symposia and publications, Turkey has known since at least the mid-1990s that the Figure is in New York as part of the famed Guennol Collection. Because the demand on a known replevin claim must be made within a reasonable time – and

this one was delayed at least twenty years – the action is clearly time-barred. *Lubell*, 77 N.Y.2d at 319, 567 N.Y.S.2d at 627, 569 N.E.2d at 430, *supra*.[6]

**B.  The Court May Take Judicial Notice of the Materials Submitted Herewith.**

Defendants' submissions, taken as they are from Turkish government publications and other reliable sources, may be considered by the Court on a motion to dismiss under Rule 12(b)(6). The Second Circuit recognizes a variety of "exceptions to Rule 12(b)(6)'s general prohibition against considering materials outside the four corners of the complaint." *Halebian v. Berv.*, 644 F.3d 122, 130 n.7 (2d Cir. 2011). For example, courts may "properly consider 'matters of which judicial notice may be taken, or documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.'" *Id.* (citation omitted). *See also* Fed. R. Evid. 201(b)(2) (court "may judicially notice a fact that is not subject to reasonable dispute because it… can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); Fed. R. Evid. 201(c)(2) (court "must take judicial notice if a party requests it and the court is supplied with the necessary information."); *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 60 (2d Cir. 2016) (court took judicial notice of publicly available document, in part because "its accuracy cannot reasonably be questioned").

Documents properly considered include public records such as court filings. *Enron Corp. v. Springfield Assocs., L.L.C*, 379 B.R. 425, 431 n.18 (S.D.N.Y. 2007). It is also entirely proper for the Court to take judicial notice of materials made available on Plaintiff's official government website (*Morris Decl.* ¶¶ 4-6). *See Andrews v. Blick Art Materials, LLC,* 2017 U.S. Dist. LEXIS

---

[6] New York law makes a critical distinction between statute of limitations and laches. Under statute of limitations analysis, Plaintiff bears the burden of proof to establish that it did not delay unreasonably in making a known claim. Any arguments made by the claimant regarding the parties' relative diligence efforts are wholly irrelevant. Such arguments are, however, relevant to a laches defense, meaning that in considering a defendant's laches defense, the court does examine the due diligence of the claimant and the possessor. *See Bakalar*, 500 Fed. Appx. at 8.

121007, at *5 (E.D.N.Y. July 31, 2017), *citing Doron Precision Sys., Inc. v. FAAC, Inc.,* 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006) ("For purposes of a 12(b)(6) motion to dismiss, a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and it is capable of accurate and ready determination.").

Finally, Defendants' submitted materials contain admissions that mortally injure Plaintiff's case. Admissions "'are always competent evidence against [the opposing party], wherever, whenever, or to whomsoever made[.]'" *People v. Chico,* 90 N.Y.2d 585, 589, 687 N.E.2d 1288, 665 N.Y.S.2d 5 (1997) (citation omitted). *See also* Fed. R. Evid. 801(d)(2) (opposing party admissions are not hearsay). In Ministry publications, sworn statements by Plaintiff's declarants, and factual assertions by Plaintiff's counsel within the scope of his role as Plaintiff's authorized representative, Turkey makes key admissions that doom its claims to dismissal. *Morris Decl.* ¶¶ 4-6, Exs. B-D.

### C.  Turkey Knew the Location and Identity of the Possessor for Over 20 Years.

Plaintiff's replevin and conversion and related claims are barred under New York's statute of limitations because Turkey failed to claim the Figure within a reasonable time of learning the identity and location of the possessor: the Guennol Collection in New York. Plaintiff had actual knowledge at least as early as 1997, when the Figure was mentioned by name in a Ministry-published volume along with citations leading to the its publication and exhibition history. *Morris Decl.* ¶ 5, Ex. C. Publications on the Ministry's website, presentations at its symposia, and the knowledge of Turkish archaeologists and museum officials like Dinç should have prompted a claim long ago.

The critical role of the newly discovered materials, particularly those found on the Ministry's own website, cannot be overstated. Plaintiff has professed it was ignorant of the

Figure until this past March (*see supra*, Factual Background Sec. A). Those statements are now known to be untrue. For over twenty years (and perhaps longer), Turkey has known that the Guennol Stargazer was outside Turkey and owned by a New York-based collection. Under New York's statute of limitations and the *Lubell* decision, its claims must be dismissed as unreasonably delayed and therefore untimely.

## II.   PLAINTIFF'S DELAY OF MORE THAN FIFTY YEARS BARS ITS CLAIM UNDER THE DOCTRINE OF LACHES.

### A.  Legal Standards Applicable to the Laches Doctrine Weigh in Favor of Dismissal.

Turkey's claims – which Plaintiff could have easily discovered fifty years ago and was aware of twenty years ago – are also barred by laches. "Laches is based on the maxim… 'equity aids the vigilant, not those who sleep on their rights.'" *Ikelionwu v. United States*, 150 F.3d 233, 237 (2d Cir. 1998) (citation and Latin omitted). A laches defense may be upheld "where it is clear that a plaintiff unreasonably delayed in initiating an action and a defendant was unfairly prejudiced by the delay." *Robins Island Pres. Fund, Inc. v. Southold Dev. Corp.*, 959 F.2d 409, 423 (2d Cir. 1992) (citations omitted). *Accord Bakalar v. Vavra*, 819 F. Supp. 2d 293, 303 (S.D.N.Y. 2011) (Possessor must show that: "(1) [Claimants] were aware of their claim [to artwork], (2) they inexcusably delayed in taking action; and (3) [Possessor] was prejudiced as a result.") (citation omitted).

Where allegedly stolen artwork is concerned, "the doctrine of laches safeguards the interests of a good faith purchaser of lost or stolen art by weighing in the balance of competing interests the owner's diligence in pursuing his claim." *Bakalar v. Vavra,* 819 F. Supp. 2d 293, 303 (S.D.N.Y. 2011), *aff'd,* 500 Fed. Appx. 6 (2d Cir. 2012), *citing Greek Orthodox Patriarchate v. Christie's, Inc.,* No. 98 Civ. 7664 (KMW), 1999 WL 673347 at *1, *7 (S.D.N.Y. Aug. 30, 1999) (other citations omitted) (Plaintiff "must show due diligence in attempting to

locate the property to defeat the laches defense"). *See also Sanchez v. Tr. of Univ. of Pa.*, No. 04 Civ. 1253 (JSR), 2005 WL 94847 at \*1, \*2 (S.D.N.Y. Jan. 18, 2004) ("a plaintiff can establish that he has not engaged in unreasonable delay by establishing that he engaged in a diligent search for the missing artwork").

In the long-running case *Bakalar v. Vavra,* claimants argued they did not have sufficient information to make a claim earlier. The district court responded:

> To have "knowledge" of their claim, Defendants need not have been aware of a claim against Bakalar specifically; it is enough that they knew of — or should have known of — the circumstances giving rise to the claim, even if the current possessor could not be ascertained.

*Bakalar*, 819 F. Supp. at 304, *citing Sanchez,* 2005 WL 94847, at \*1-3 (laches found despite the fact that the possessor of the allegedly stolen artifacts was unknown by the Plaintiff until shortly before the lawsuit was filed);[7] *Greek Orthodox,* 1999 WL 673347, at \*10 (same). Here, Turkey knew much more than the existence of its claim, which it says it learned in 1994-95 (Dkt #29, Zoroglu Decl. ¶11); it knew the identity and location of the last possessor. Where a claimant has a duty of diligence – as Turkey does in order to defeat laches under *Lubell* – the clock begins to run when Plaintiff has "inquiry notice" of its alleged injury, namely when it knew or should have known of the injury. *Koch v. Christie's Int'l PLC*, 785 F. Supp. 2d 105, 114 (S.D.N.Y. 2011), *aff'd*, 699 F.3d 141 (2d Cir. 2012).

---

[7] The Court of Appeals added (*Bakalar*, 500 Fed. Appx. at 8):

> Vavra and Fischer argue that their families had no legal duty of diligence until they knew of the actual *location* of the Drawing. They rely on language in *Lubell* declining to "impose the additional duty of diligence before the true owner has reason to know where its missing chattel is to be found." 77 N.Y.2d at 320. However, though "[l]ack of diligence in locating the property" is not a consideration under a statute of limitations analysis, it is absolutely relevant "with respect to a laches defense."

Under these standards, there can be no question that Turkey has unreasonably delayed. In this litigation, Plaintiff has had multiple opportunities to present its views on laches and has been unable to cite a single case in which failure to assert a claim to publicly displayed property for anything like five decades was excused and not barred by laches. Dkt #27, *Pltf PI MOL* at 17.[8] Now that the truth of Turkey's actual knowledge – for a period of more than twenty years – has been revealed, Plaintiff's task of showing reasonable diligence has become well-nigh impossible. Christie's diligence compares very favorably to Turkey's, since Christie's research established possession in the U.S. before 1970 (the year of the adoption of UNESCO's Convention on the Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property), and identified repeated exhibitions at the Met and multiple publications. Dkt #38-1, *Bernheimer Decl.* Ex. A. Likewise, Steinhardt's 1993 purchase would have been based on the Figure's presence in the United States since the 1960s and its history of exhibition at the Met. Given the passage of so many years, the loss of witnesses and documents, and Defendants' investments in the Figure, prejudice is easy to see.

**B. Turkey Unreasonably Delayed Making its Claim to the Figure.**

Documents show that Plaintiff could have found the Figure at the Met at any time after 1966 and that it actually knew of its potential claim against the Figure by 1997. Plaintiff knew everything it needed to know to file suit: the existence of the object, the identity of the possessor, and the last known location of the Guennol Stargazer – referenced by name in the 1997 Ministry

---

[8] The cases involving long delays that Plaintiff has cited all involved objects that *could not possibly have been discovered* because they were never published or exhibited, and had been concealed in private collections (*Sotheby's v. Shene*, No. 04 Civ. 10067 (TPG), 2009 WL 762697 at *1, *4 (S.D.N.Y. Mar. 23, 2009) (book was secreted in a private collection for decades); *Vineberg v. Bissonnette*, 548 F.3d 50, 54 (1st Cir. 2008) (painting "sequestered" in a private collection for more than 60 years)), or in undetermined locations. *In re Flamenbaum,* 1 N.E.3d 782, 783 (N.Y. 2013) (research never determined the pathway of stolen antiquity which disappeared from a Berlin museum in 1945 and "resurfaced" in Nassau County in 2003).

publication, and by sources cited therein and in related documents. In fact, "Glories of the Past," the 1991 book about the Levy-White Collection used by Turkey to locate the Weary Herakles statue at the Met, references both the Guennol Stargazer *and* Weary Herakles. Dkt #38-5, *Bernheimer Decl.* Ex. E at 9.

Based on this information, Turkey could have inquired with the Guennol Collection and then made a claim on the Collection, on the Met, or on Steinhardt, as Plaintiff did with Christie's here. "[W]here the question of laches is in issue, the plaintiff is chargeable with such knowledge as he might have obtained upon inquiry." *Johnston v. Standard Mining Co.*, 148 U.S. 360, 370 (1893). Having been in possession of information sufficient to spark an inquiry about the Guennol Stargazer and the Guennol Collection, Turkey cannot now be heard to protest that it "was alerted" to the whereabouts of the Figure only when informed of Christie's Exceptional Sale in March 2017 (Dkt #65, *Compl.* ¶ 30), and that "when they learned about it, they moved against it." Dkt #18, *TRO Tr.* at 18:4-5. Whether measured by the fifty years in which Plaintiff could easily have found the Figure at the Met or in publications, or the twenty years in which it knew of the Guennol Stargazer's existence and location, Turkey's claim was unreasonably delayed to Defendants' prejudice and is untimely.

## C. Turkey's Delay Prejudiced Defendants.

Plaintiff's lengthy delay in claiming the Figure inevitably and demonstrably prejudiced Defendants. "A defendant may suffer prejudice either because it would be inequitable, in light of a change in defendant's position… or because the delay makes it difficult to garner evidence to vindicate his or her rights." *Robins Island*, 959 F.2d at 424. In this case, both types of prejudice are present. Witnesses have died, documents have undoubtedly been lost, and decisions and

investments have been made based upon Plaintiff's lack of diligence. *See Greek Orthodox*, 1999 WL 673347, at *10 (citing deceased witnesses, faded memories, and missing documents).

As in *Bakalar*, the loss of eyewitnesses here is particularly prejudicial. 819 F. Supp. 2d at 306 ("the greatest significance is the death of [the original owner], perhaps the only person who could have elucidated the manner in which she came to possess the [d]rawing, or indeed, whether she owned it at all."). *See also Sanchez*, 2005 WL 94847, at *3 (due to over thirty years' delay, "[a]ny depositions or other inquiries of the [eyewitnesses] are no longer possible; any records of these individuals are no longer in existence or available; and the original parties to the [purchase] are long deceased"). If Plaintiff had brought this claim prior to 2010, the parties would have had access to Guennol Collection co-founder Alastair Bradley Martin and perhaps other eyewitnesses. The lapse in time also likely results in a critical loss of documents and files – through motions for a temporary restraining order and preliminary injunction, Turkey provided no documentary evidence to support its claim.

Moreover, Christie's investment in an extensive promotional campaign was based on the Figure's excellent pre-1970 provenance, including a long record of publications and exhibitions at the Met. Christie's contacted numerous sources for information, including Guennol Collection heir Robin Martin, and learned that the Martins loaned the Figure to the Met in 1966. Dkt #38, *Bernheimer Decl.* ¶¶ 11-12. Christie's would not have accepted the Figure for sale or invested heavily in its promotion had Plaintiff claimed ownership at any time over the past half-century.

Likewise, Steinhardt would likely not have purchased the Figure had Turkey made a claim before 1993. He is prejudiced by Plaintiff's delay because he "has changed his position in a way that would not have occurred if the plaintiff had not delayed." *Goodman v. McDonnell Douglas Corp.*, 606 F.2d 800, 808 n.17 (8th Cir. 1979). The eight publications submitted with

the Bernheimer Declaration (Dkt #38) *all* date from before Steinhardt's 1993 purchase, as does Acar's 1989 article. *Morris Decl.* Ex. F. Steinhardt based his expectations of lawful acquisition on decades of unfettered exhibition and publication – only to be surprised by Plaintiff's re-energizing of its heretofore desultory repatriation efforts.

### D. Dismissal on the Grounds of Laches is Appropriate.

Dismissal of this case on the basis of laches is entirely appropriate since the damning facts are established through the Complaint, Turkey's admissions, and other reliable sources. *See, e.g., Matter of Peters*, 34 A.D.3d 29 (App. Div. 1st Dept. 2006) (reversing grant of application for pre-action discovery and dismissing case as barred by laches), *citing Wertheimer v. Cirker's Hayes Storage Warehouse, Inc.*, 300 A.D.2d 117, 118 (App. Div. 1st Dept. 2002) (where the original owner's lack of due diligence and prejudice to the party currently in possession are apparent, the issue may be resolved as a matter of law).

Plaintiff has argued that it did not delay unreasonably because it cannot exhaustively police the antiquities trade when there are so many auctions and so many objects disappearing into private collections. Dkt #27, *Pltf PI MOL* at 17; Dkt #29, *Zoroglu Decl.* ¶ 6; Dkt #18, *TRO Tr.* 16:17-20 ("[T]hough Turkey does diligently search for it's [*sic*] looted antiquities, it cannot find every private sale. It cannot find every private collection.") (Mr. Kaye). In cases where the object could not reasonably have been found, courts can accommodate such limitations and rule in favor of claimants. *See* note 8, *supra*. But these cases provide no support to Plaintiff. Here, the Figure was in the public eye and well-known to archaeologists – not to mention specifically known by the Ministry, as admitted in its own publications. *Morris Decl.* Exs. B-D. The Figure was on loan to the Met for decades (Dkt #29-1, *Zoroglu Decl.* Ex. A; Dkt #38, *Bernheimer Decl.*

¶ 9) and published many times in different languages and in international publications. *Morris Decl.* Ex. A.

An idol of such renown, and *whose existence and location were known by Plaintiff*, should have been claimed long ago. *See, e.g., Orkin v. Taylor*, 487 F.3d 734, 742 (9th Cir. 2007) (under California law, claim to painting was time-barred because the possessor and location were widely publicized). *Accord Museum of Fine Arts, Boston v. Seger-Thomschitz,* 623 F.3d 1, 7-8 (1st Cir. 2010) ("[i]n contrast to many missing art cases, the location of the Painting has been no secret in this case. The Painting has long been on public display at the MFA, a major international museum"); *Detroit Institute of Art v. Ullim*, No. 06-10333, 2007 WL 1016996, at *1, *3 (E.D. Mich. Mar. 31, 2007) (Plaintiff should have known of claim long before); *Toledo Museum of Art v. Ullin*, 477 F. Supp. 2d 802, 807-08 (N.D. Ohio 2006) (presence of painting in museum and painting's provenance not concealed). Turkey's delay, measured in decades, was unreasonable and has unduly prejudiced Defendants, whose diligence far exceeded Plaintiff's.[9]

## CONCLUSION

Turkey would have this Court believe that it did not know about this extremely important object's existence, its location outside Turkey, or the identity of its possessor until March 2017. None of these assertions is true. The Ministry's and other publications submitted herewith plainly show not only that the Figure was in the public eye, including at the Met, and widely known for fifty years, but also that Turkey knew as early as 1997 that the Guennol Stargazer

---

[9] Plaintiff accuses Defendants of unclean hands in acquiring and attempting to sell the Guennol Stargazer. Dkt #27 at 20-21. *Bakalar* holds, "Courts apply the maxim requiring clean hands where the party asking for the invocation of an equitable doctrine has committed some unconscionable act that is directly related to the subject matter in litigation and has injured the party attempting to invoke the doctrine." 819 F. Supp. 2d at 306. Buying an object with a long history of highly public exhibitions and publications, then offering it for sale, hardly qualifies as unconscionable.

21

existed, was not in Turkey, and could be found in the Guennol Collection in New York or, through simple inquiry, at the Met. Turkey's view that it cannot act on all of its lost objects, therefore is justified in sitting on knowable and even known claims and then pursue them at its pleasure and convenience, is inconsistent with the law of New York and would set a disastrous precedent for collectors, museums and the art market. Accordingly, Defendants ask that this Court dismiss Plaintiff's Second Amended Complaint in its entirety, with prejudice.

Date:   August 28, 2017          */s/ Thomas T. Kline*
                                 THOMAS R. KLINE
                                 CULTURAL HERITAGE PARTNERS, PLLC
                                 1271 Avenue of the Americas, 43rd Floor
                                 New York, NY 10020
                                 tom@culturalheritagepartners.com

                                 L. EDEN BURGESS
                                 CULTURAL HERITAGE PARTNERS, PLLC
                                 2101 L Street NW, Suite 800
                                 Washington, DC 20037
                                 eden@culturalheritagepartners.com

                                 202-567-7594 Telephone
                                 866-875-6492 Facsimile

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that the foregoing Motion to Dismiss was served upon

the following via email and via the Court's ECF system on August 28, 2017:

> Lawrence Kaye
> Frank Lord
> Jason D'Angelo
> Herrick, Feinstein
> 2 Park Ave.
> New York, NY 10016
> lkaye@herrick.com
> flord@herrick.com
> jdangelo@herrick.com
>
> *Counsel to Plaintiff*

> */s/ Lesley Parrish*
> Lesley Parrish