UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

Republic of Turkey,

                Plaintiff-Counterclaim Defendant,

    -against-

Christie's Inc., *et al.*,

                Defendants-Counterclaimants,

Anatolian Marble Female Idol of Kiliya Type,

                Defendant-in-rem.

17 Civ. 3086 (AJN)

OPINION
AND ORDER

---

ALISON J. NATHAN, District Judge:

The Republic of Turkey brings this case against Christie's and Michael Steinhardt, as well as the Idol—Defendant-in-rem Anatolian Marble Female Idol of Kiliya Type. This diversity action arises from the alleged unlawful excavation and smuggling of the Idol, a millennia-old cultural artifact that Turkey claims it owns pursuant to its patrimony law, out of Turkey. The Idol ultimately made its way into the hands of Steinhardt, a private collector in the United States. The Second Amended Complaint alleges New York state law claims of conversion and replevin and seeks a declaratory judgment that all right, title, and interest in and to the Idol is vested in Turkey. Dkt. No. 65. Christie's and Steinhardt have counterclaimed, alleging New York state law claims of tortious interference with contract, or, in the alternative, tortious interference with prospective economic advantage, and seek a declaratory judgment that all right, title, and interest in and to the Idol is vested in Steinhardt. Dkt. No. 122.

Before the Court are two motions for summary judgment—Christie's and Steinhardt's motion for summary judgment on Turkey's claims, Dkt. No. 190, and Turkey's motion for summary judgment on Christie's and Steinhardt's counterclaims, Dkt. No. 196—as well as Turkey's *Daubert* motion, Dkt. No. 194, and various requests made by the parties to file briefing papers and exhibits associated with these motions with redactions or entirely under seal. For the reasons that follow, Christie's and Steinhardt's summary judgment motion is DENIED, Turkey's summary judgment motion is GRANTED, and the parties' sealing requests are DENIED without prejudice. The Court reserves judgment on Turkey's *Daubert* motion.

## I. BACKGROUND

### A. Factual Background Prior to Filing of this Suit

The following facts are undisputed unless specifically noted. In or around 1961, Alastair and Edith Martin, American collectors, acquired the Idol, an Anatolian marble female Idol of Kiliya-type that dates to at least 2200 B.C.E. and, research suggests, may be even older, from J.J. Klejman Gallery. Dkt. No. 252 ¶¶ 1–2, 4–5. Kulaksizlar, located in modern-day Turkey, is the only workshop known to have produced Kiliya-type idols. *Id.* ¶ 3. In 1966, the Martins loaned the Idol, a part of their so-called "Guennol Collection," to the Metropolitan Museum of Art. *Id.* ¶¶ 6, 33. Between 1966 and 1993, the Idol was on loan to the Met, *id.* ¶ 33, and in 1993, the Martins sought return of the Idol from the Met, *id.* ¶ 11. The Merrin Gallery ultimately received the Idol on July 16, 1993, and Steinhardt acquired the Idol from the Merrin Gallery on or around August 16, 1993. *Id.* ¶¶ 12–13. The Judy and Michael Steinhardt Collection subsequently loaned the Idol back to the Met in 1999. *Id.* ¶ 38. It remained on loan to the Met between 1999 and 2007. *Id.* ¶ 38.

Around March 2, 2017, Steinhardt consigned the Idol to Christie's for sale, and it was delivered to Christie's that same day. *Id.* ¶¶ 15–16. Christie's conducted provenance research and listed the Idol's provenance as tracing back to "1966 or prior," when it was acquired by the Martins. *Id.* ¶¶ 17–18, 21. Christie's listed the Idol, along with its provenance information, in

the catalogue for its scheduled April 28, 2017 auction. *Id.* ¶¶ 20–21. Around March 26, 2017, Turkey learned about the planned sale of the Idol. *Id.* ¶ 66. On April 19, 2017, Ertan Yalçin, then the Consul General from the Turkish Consulate General in New York, sent Christie's a letter claiming that the Idol is likely of Turkish origin, and, as such, is state property protected under Turkish law. *Id.* ¶ 26; Dkt. No. 38-9. Turkey claims ownership of the Idol under a 1906 Ottoman Decree.

## B. Factual Background Following Filing of this Suit

Turkey commenced this diversity action on April 27, 2017 and immediately sought a temporary restraining order enjoining sale of the Idol at the scheduled April 28, 2017 auction. Dkt. Nos. 1, 3. The Court denied that relief with the following conditions: 1) that Christie's "announce orally in advance of the auction that the Republic of Turkey has asserted a claim of ownership" over the Idol; and 2) that Christie's retain possession of the Idol for 60 days and "delay receipt of funds by any successful bidder" during that time. Dkt. No. 18 at 45:25–46:21. Prior to opening bidding on the Idol on April 28, 2017, Christie's read a statement setting forth these conditions and noting that the buyer would have a right of cancellation if not satisfied with the terms of the sale. Dkt. No. 252 ¶ 29. The Idol ultimately sold for a high bid of $12,700,000. *Id.* ¶ 30. The buyer (the "High Bidder"), however, never took possession of the Idol, though the parties contest whether he ultimately "canceled the purchase," or "withdrew from consummating the sale." *Id.* ¶¶ 31–32. The Idol remains in Christie's possession. Dkt. No. 252 ¶ 2.

On the day of the auction, *The New York Times* published an advertisement, or "advertorial," entitled an "Open Letter from the Ministry of Culture and Tourism of the Republic of Turkey," that Finn Partners, a public relations firm, created for the Ministry of Culture and Tourism. Dkt. No. 225 ¶¶ 23–25. The advertisement contained "stylized images of the Idol," and thanked certain museums and "all the private collectors, auction houses, and universities for returning 4272 pieces of cultural heritage." *Id.* ¶ 24. The advertisement, which did not directly reference Christie's or the auction, was ultimately approved by Minister Avcı, then-Culture and

Tourism Minister. *Id.* ¶¶ 34–35. On the same day, Minister Avcı also made a statement to the press that Turkey had "taken steps in order to stop the sale of this work and inform the possible recipient that this was abducted from Turkey." *Id.* ¶ 38. A demonstration was also held outside Christie's that day by individuals holding red and white protest signs and bearing a banner of the Idol. *Id.* ¶ 40. The parties contest whether Turkey itself was involved in this demonstration. *Id.* ¶ 41.

### C.      Procedural Background

On June 23, 2019, nearly two months after the auction, Turkey moved to compel disclosure of the identity of the High Bidder. *See* Dkt. No. 47. The Court granted that motion, finding that Turkey made "a reasonable case that the Bidder might have relevant information to provide the Republic." Dkt. No. 62 at 5. On August 28, 2017, Christie's and Steinhardt moved to dismiss the Second Amended Complaint, Dkt. No. 74, which was denied on May 8, 2018 because their assertions relied "on documents outside of the complaint" that were "not attached to or incorporated in the complaint," and thus their arguments were premature. Dkt. No. 101. In its subsequent answer to the Second Amended Complaint, Christie's and Steinhardt asserted counterclaims against Turkey, Dkt. No. 107, and Turkey moved to dismiss those Counterclaims on June 12, 2018, Dkt. No. 114. Christie's and Steinhardt amended their counterclaims on June 29, 2018, Dkt. No. 122, and Turkey again moved to dismiss them on July 6, 2018, Dkt. No. 124.

On December 7, 2018, the parties filed the motions for summary judgment at issue here. *See* Dkt. No. 190; Dkt. No. 196. At the same time, Turkey also filed a *Daubert* motion to exclude expert testimony from two of Christie's and Steinhardt's experts. Dkt. No. 194. On March 29, 2019, the Court terminated Turkey's motion to dismiss the counterclaims, finding it mooted by its subsequent filing of a motion for summary judgment on the counterclaims. Accordingly, now before the Court are the parties' respective motions for summary judgment and Turkey's *Daubert* motion.

## II. APPLICABLE LAW

As an initial matter, because this is a diversity action, it could raise choice of law questions. The parties, however, agree that New York law applies to all substantive claims and affirmative defenses, including the statute of limitations defense. *See* Dkt. No. 236-1 at 4–5; Dkt. No. 230 at 2–3; *see also* Dkt. No. 210 at 14–25; Dkt. No. 223 at 3–19. They also agree that Turkish law governs the antecedent question of whether Turkey has a property interest in the Idol. *See* Dkt. No. 236-1 at 13; Dkt. No. 230 at 12–14. Specifically, the parties contest whether the 1906 Ottoman Decree vests ownership of the Idol in Turkey. That Decree provides, in relevant part, that "[a]ll monuments and immovable and movable antiquities . . . are the property of the Government of the Ottoman Empire." Dkt. No. 202-7 at 23.

Because no party has raised any dispute as to what law applies, the Court assumes for purposes of this Opinion and Order that New York law applies to the parties' claims and that Turkish law—and in particular the 1906 Decree—is determinative of whether Turkey owns the Idol.

## III. SUMMARY JUDGMENT STANDARD

To prevail on a summary judgment motion, the moving party generally must demonstrate that "'there is no genuine issue as to any material fact' and 'the moving party is entitled to a judgment as a matter of law.'" *Anyanwu v. City of New York*, No. 10 Civ. 8498, 2013 WL 5193990, at *1 (S.D.N.Y. Sept. 16, 2013) (quoting Fed. R. Civ. P. 56(a); *Nabisco, Inc. v. Warner–Lambert Co.*, 220 F.3d 43, 45 (2d Cir. 2000)). When the burden of proof at trial would fall on the non-moving party, however, the moving party may meet its burden by "point[ing] to a lack of evidence . . . on an essential element" of the non-moving party's claim. *Simsbury-Avon Preservation Club v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009).

There is a genuine issue of material fact if a reasonable jury could decide in the non-moving party's favor. *Nabisco*, 220 F.3d at 45. The court "is not to weigh the evidence but is

instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (internal quotation marks omitted); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).

To survive a summary judgment motion, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). In doing so, the non-moving party "'must do more than simply show that there is some metaphysical doubt as to the material facts' and 'may not rely on conclusory allegations or unsubstantiated speculation.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010)).

## IV. CHRISTIE'S AND STEINHARDT'S MOTION FOR SUMMARY JUDGMENT

### A. The Statute of Limitations Does not Bar Turkey's Claims

Christie's and Steinhardt argue that they are entitled to summary judgment on Turkey's claims because those claims are barred by the relevant statute of limitations. The Court disagrees.

The three-year statute of limitations for the recovery of chattel set out in New York CPLR § 214(3) applies to Turkey's conversion and replevin claims, as well as its declaratory judgment claim. *See Vigilant Ins. Co. of Am. v. Hous. Auth. of City of El Paso, Tex.*, 87 N.Y.2d 36, 40–41 (N.Y. 1995) ("[T]he CPLR prescribes no general period of limitation for a declaratory judgment action. Courts must look to the underlying claim and the 'nature of the relief sought' to determine the applicable period of limitation."). The statutes of limitations for these claims begin running upon accrual of the claim. *Swain v. Brown*, 135 A.D.3d 629, 631 (1st Dep't 2016). However, under New York law, the date of accrual varies depending on whether the

current possessor is a so-called good faith purchaser or bad faith possessor. *See id.* A claim accrues—and thus the statute of limitations begins to run—against a bad faith possessor "immediately from the time of wrongful possession" because the bad faith possessor's possession is necessarily unlawful *ab initio*. *Id.* On the other hand, conversion and replevin claims "against a person who lawfully comes by a chattel" accrue *not* "upon the stealing or the taking, but upon the defendant's refusal to convey the chattel upon demand." *Menzel v. List*, 49 Misc. 2d 300, 304–05 (Sup. Ct. N.Y. Cty. 1966).

This distinction is attributable to the fact that a good-faith purchaser's possession of stolen property is not wrongful until she is put on notice, via a demand for return of the property, that such property is stolen. *See Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc.*, 87 F.3d 44, 49 (2d Cir. 1996). It is her refusal of such a demand that transforms her previously lawful possession into an unlawful one. *See id.* ("[O]ne in lawful possession shall not have such possession changed into an unlawful one until [s]he 'be informed of the defect of his title and have an opportunity to deliver the property to the true owner . . . .'" (citation and internal quotation marks omitted)). Accordingly, if the possessor is a good faith purchaser, a claim does not accrue—and thus the statute of limitations does not begin to run—until demand and refusal for the simple reason that the statute of limitations for conversion and replevin cannot begin to run *before* the possession becomes unlawful.

Because there is no evidence in the record that Steinhardt is a bad faith possessor, and indeed both parties concede that he is not, *see* Dkt. No. 236-1 at 9; Dkt. No. 230 at 7, the demand and refusal rule applies here. Accordingly, Turkey's claims accrued, and the three-year statute of limitations began to run, when it demanded the Idol and Christie's and Steinhardt refused,

which occurred on April 19, 2017. Dkt. No. 252 ¶ 26. Turkey's claims are thus timely unless an exception to the demand and refusal rule applies.

Christie's and Steinhardt argue that because Steinhardt openly dealt with the Idol, Turkey is precluded from invoking the demand and refusal rule. However, the cases they cite in support of this argument make clear that a possessor openly dealing with property as her own only precludes the demand and refusal rule if the possessor knew the property was not hers before doing so. Demand and refusal is unnecessary in these cases not by virtue of the fact that the possessor openly deals with the property as her own, but because she is *already* on notice that it is not hers when she does so. The act of openly dealing with it as if it were her own is relevant under those circumstances because it transforms her good faith possession into a conversion and starts the running of the statute of limitations.

For example, in *Songbyrd, Inc. v. Estate of Grossman*, the primary case upon which Christie's and Steinhardt rely, the master recording tapes at issue were delivered to the defendant "as demonstration tapes only, *without any intent*" for the defendant to possess them as an owner, but the record company of which defendant was president nonetheless subsequently licensed some of the tapes. *Id.* at 174–75 (emphasis added). The Second Circuit found that "[w]here required, the demand-and-refusal rule 'change[s] the character' of a good-faith possession before an action for conversion or recovery of a chattel can be maintained," but that, under the circumstances, "no demand and refusal" was required because "the 'character' of [the] possession" had *already* been changed by the record company's licensing of master recording tapes it knew it did not own. *Id.* at 183; *see also Wallace Wood Properties, LLC v. Wood*, 669 F. App'x 33, 34 (2d Cir. 2016) (summary order) (finding that the claim accrued before 2011 where the complaint alleged that the defendant "knew she was not the rightful owner of the art" in

question and subsequently sold two pieces of it in 2010). Unlike in *Songbyrd*, as the parties concede, Steinhardt did not have any knowledge that the Idol was not his when he lent it to the Met. Accordingly, demand and refusal *was* required to change the character of his good-faith possession and thus to start the running of the statute of limitations.

Moreover, the Court agrees with Turkey that a footnote in *Williams v. National Gallery of Art*, suggesting in dicta that the National Gallery's public display of a painting obviated the demand and refusal requirement *even though* the Gallery had no knowledge that the painting had allegedly been looted, cannot be reconciled with New York law as articulated above. 2017 U.S. Dist. LEXIS 154445, *1 (S.D.N.Y. September 21, 2017). Where the possessor has no knowledge that the property is not his, *there can be no conversion* in the absence of a demand and refusal, and concluding otherwise would constitute a wholesale rejection of the demand and refusal rule that has governed the accrual of conversion claims in New York since the mid-20th century. *See Menzel*, 49 Misc. 2d at 304–05. Accordingly, because Steinhardt did not deal openly with the Idol as his own knowing it in fact was not, a demand and refusal was required to "'change the character' of [his] good-faith possession." *SongByrd*, 206 F.3d at 183.

Christie's and Steinhardt also argue that even were the demand and refusal rule to apply, Turkey's claim is time-barred because it unreasonably delayed bringing a known claim. The Court again disagrees. The New York Court of Appeals has recognized, with good reason, that the "the true owner, having discovered the location of its lost property, cannot unreasonably delay making demand upon the person in possession of that property." *Solomon R. Guggenheim Found. v. Lubell*, 77 N.Y.2d 311, 319 (1991). However, "[w]hether unreasonable delay starts the statute [of limitations] running" or instead is relevant only to a laches defense "remains an open question under New York law." *Grosz v. Museum of Modern Art*, 772 F. Supp. 2d 473, 482

(S.D.N.Y.), *aff'd*, 403 F. App'x 575 (2d Cir. 2010). While there is case law suggesting that unreasonable delay does factor into the statute of limitations analysis, *see Lubell*, 77 N.Y.2d at 319 (citing *Heide v. Glidden Buick Corp.*, 188 Misc. 198, 199 (App. Term 1947)); *Marchig v. Christie's Inc.*, 430 F. App'x 22, 25 (2d Cir. 2011) (summary order), this Court agrees with other courts in this District that the "issue of unreasonable delay is relevant only to the defense of laches—even where, as here, it is undisputed that a potential plaintiff . . . had actual knowledge of the whereabouts" of the missing artwork at issue. *Grosz*, 772 F. Supp. 2d at 483; *see also Republic of Turkey v. Metro. Museum of Art*, 762 F. Supp. 44, 46–47 (S.D.N.Y. 1990). The contrary rule Christie's and Steinhardt suggest is irreconcilable with the demand and refusal rule, because it allows the limitations period to begin running against a good faith purchaser prior to the point at which the "character of her possession" has changed from lawful to unlawful. Because a statute of limitations begins running, by definition, when a claim accrues and *not before*, the Court concludes that unreasonable delay in bringing a known claim is relevant only to the defense of laches and has no effect on the statute of limitations.[1]

Because none of the exceptions to the demand and refusal rule identified by Christie's and Steinhardt apply, and thus Turkey's claims are timely, they are not entitled to summary judgment on statute of limitations grounds.

### B. Interpretation of and Ownership Under the 1906 Ottoman Decree

Christie's and Steinhardt also argue that they are entitled to summary judgment because Turkey cannot carry its burden to show that it owns the Idol. As discussed above, the parties agree that Turkish law is the only law relevant to the question of whether Turkey owns the Idol.

---

[1] Though laches can be decided as a matter of law under certain circumstances, see *Zuckerman v. Metro. Museum of Art*, 928 F.3d 186, 195 (2d Cir. 2019), the Court does not consider a laches defense here because no such defense was raised in Christie's and Steinhardt's summary judgment motion.

The parties also agree that the only relevant provision of Turkish law is the 1906 Ottoman Decree. *See* Dkt. No. 236-1 at 14; Dkt. No. 230 at 12–14; *see also* Dkt. No. 202-8 at 26. Christie's and Steinhardt argue that the Decree is *not* an ownership law and thus does not vest any property interest in Turkey. As a result, they argue, it is not "enforceable" in this Court, because without any property interest in the Idol, Turkey cannot maintain the conversion and replevin claims it asserts here.

They further argue, in the alternative, that even if the Decree is an ownership law, they are still entitled to summary judgment because there is no evidence of where or when the Idol was excavated and exported, and, in the absence of any such evidence, no reasonable juror could find that Turkey owns the Idol under the Decree. They are wrong on both counts.

### 1. The 1906 Decree is an Ownership Law

What Christie's and Steinhardt characterize as a question of "enforceability" of the 1906 Decree is actually one of interpretation. As noted, while New York law may govern Turkey's conversion and replevin claims, the parties agree that "local law"—in this case Turkish law— "controls the analytically prior issue[] of . . . whether any person or entity has a property interest in the item" such that a conversion or replevin claim can be maintained. *United States v. Portrait of Wally*, 105 F. Supp. 2d 288, 292 (S.D.N.Y. 2000). Turkey claims ownership of the Idol pursuant only to the 1906 Decree. Whether the Decree is in fact an ownership law—and thus whether Turkey can maintain the conversion and replevin claims it asserts here—is a question of the proper interpretation of foreign law for the Court to decide as a matter of law. *See* Fed. R. Civ. P. 44.1.

In determining whether foreign law vests ownership of antiquities in the state, courts must look first to the plain language of the relevant law. *See United States v. Schultz*, 333 F.3d 393, 399 (2d Cir. 2003) (analyzing Egyptian statute's text first). In this case, "the language of the [Decree] itself . . . unequivocally asserts state ownership" of the Idol. *See id.*

Article 4 of the 1906 Decree provides that

> [a]ll monuments and immovable and movable antiquities situated in or on land and real estate belonging to the Government and to individuals and various communities, the existence of which is known or will hereafter become known, are the property of the Government of the Ottoman Empire. Consequently, the right to discover, preserve, collect and donate to museums the aforementioned belongs to the Government.

Dkt. No. 202-7 at 23. The Decree further defines antiquity as "[a]ny work or any kind of product without exception, by any and all types of ancient peoples which once existed in or on the lands ruled by the Ottoman Government, related to fine arts, science, literature, religion and craft." *Id.* Thus, by its plain terms, movable and immovable antiquities found on both public and private lands were "the property of the Government of the Ottoman Empire" during the time of its existence, and of modern-day Turkey thereafter. *See* Dkt. No. 202-7 at 5.

Where, as here, the plain language of the law is "clear and unambiguous," the defendant may still present evidence that the law is nonetheless "not what its plain language indicates it is," by, for example, offering evidence that people within the country may nonetheless legally keep antiquities or that the law is otherwise generally not enforced. *See Schultz*, 333 F.3d at 401–02 (considering evidence offered by defendant and finding that defendant "failed to present any evidence at the hearing or at trial that Law 117 *is not what its plain language indicates it is*, that is, an ownership law" (emphasis added)); *see also United States v. Schultz*, 178 F. Supp. 2d 445, 447–48 (S.D.N.Y. 2002), *aff'd*, 333 F.3d 393 (2d Cir. 2003) (finding that defendant was "unable to adduce any material, let alone persuasive evidence to support" his argument that the law was not, as its plain language suggested, an ownership law). The plaintiff may also—but is not required to—offer evidence, for example of the state's "active enforcement of its ownership rights," to "confirm the intent of the law." *Schultz*, 333 F.3d at 402; *see also United States v. One Tyrannosaurus Bataar Skeleton*, 2012 WL 5834899, at *10 (S.D.N.Y. Nov. 14, 2012)

("*Schultz* states that enforcement is probative of the intent behind a foreign law, but the opinion falls short of making active enforcement a pleading requirement.").

For purposes of this summary judgment motion, Turkey has presented evidence "confirming" the intent of the law, and, on the record before the Court, Christie's and Steinhardt have not offered sufficient evidence to the contrary to "overcome the combination of (1) the plain text of the [Decree], and (2) the [evidence] to the effect that the [Decree] is a true ownership law and is enforced as such." *Schultz*, 333 F.3d at 401. Turkey points to evidence in the record of the prohibition of private ownership of antiquities under the Decree and domestic enforcement of it that confirms that the Decree is what it says it is—an ownership law. *See, e.g.*, Dkt. No. 202-9 at 5 (citing a 1944 case in which the Decree was enforced against a private citizen); Dkt. No. 202-10 at 10–12 (citing three high-profile attempts by Turkey, all in 1970, while the Decree remained in effect, to recover allegedly looted antiquities); *see also id.* at n.3 (citing a November 3, 1970 article discussing "formal letters [written] to the Boston Museum of Fine Arts, the Metropolitan Museum of New York and Dumbarton Oaks Museum, demanding the return of recently acquired objects" and a successful recovery of a statue head from the Cleveland Museum). Even if the Decree was underenforced, as evidence from Christie's and Steinhardt's expert suggests, *see* Dkt. No. 202-3 at 11–12, these high-profile examples of enforcement are nonetheless probative of the law's intent.

The evidence Christie's and Steinhardt offer—that the 1906 Decree's validity was only "*reaffirmed*" by the Constitutional Court in 1965, *see* Dkt. No. 202-1 at 18 (emphasis added), that Turkey's enforcement efforts were "hindered" by the fact that the law was only available in ancient Turkish until the 1960s, Dkt. No. 202-2 at 4, and that Turkey failed to adequately publicize the law, especially internationally, Dkt. No. 202-3 at 8–11—is insufficient to overcome

the combination of Turkey's evidence and the plain language of the Decree, which makes clear

that the Turkish government claims ownership of all antiquities found in Turkey after 1906.

*Schultz*, 333 F.3d at 402. Indeed, Turkey's Turkish law expert points out that because "the

Turkish Republic is a successor to the Ottoman State, any Ottoman law is also enforced or

applied in the Turkish Republic period" unless it is either abrogated by or in conflict with new

law. Dkt. No. 202-9 at 3. Accordingly, the 1965 decision only reaffirmed the status quo—

namely, that the Decree remained in effect. And, as discussed further below, the other two of

these three examples are of little relevance, because the fact that the Decree was not translated or

publicized has little bearing on whether it is an ownership law.

Christie's and Steinhardt's argument that Turkey's ownership law nonetheless should not

be "enforced" by this Court because it has not been adequately translated and publicized is

misplaced. Christie's and Steinhardt derive from *United States v. McClain*, 593 F.2d 658 (5th

Cir. 1979), a general principle that ownership laws must be sufficiently clear and translated "into

terms understandable" by Americans to be enforceable in any U.S. court. *Id.* at 670. However,

that case—which is not binding on this Court—does not stand for the proposition that an

ownership law must be literally translated (into English) and widely publicized before a U.S.

court can find that it vests ownership in the state. Rather, like *Schultz*, *McClain* holds only that

an antiquities law must, by its terms, "clear[ly] and unequivocal[ly] . . . claim[] ownership of all

artifacts" in order to vest property rights in the state. *Id.* at 670–71. To the extent that its

holding can be read to go any further, such a holding is based on the vagueness doctrine and fair

notice concerns implicated in the criminal context and is inapposite where, as here, only civil

liability is at stake. Accordingly, Christie's and Steinhardt's arguments that the 1906 Decree was

neither widely publicized nor translated into English have no impact on that fact that it, by its plain terms, is an ownership law that vests ownership of antiquities in Turkey.

Because Christie's and Steinhardt have failed to present sufficient evidence that the Decree "is not what its plain language indicates it is," *Schultz*, 333 F.3d at 401, they are not entitled to summary judgment on the ground that it does not vest any ownership rights to the Idol in Turkey.

### 2. There Are Genuine Disputes of Material Fact Regarding Ownership of the Idol

Christie's and Steinhardt argue in the alternative that they are entitled to summary judgment because there is no evidence that Turkey owns the Idol under the 1906 Decree. In order for Turkey to establish ownership under the 1906 Decree, it must prove that the Idol was found within and exported from the boundaries of modern-day Turkey while the Decree was in effect. Christie's and Steinhardt assert that Turkey has presented no evidence of the Idol's find spot, nor of the date of its excavation and exportation. However, the record demonstrates that there are genuine disputes of material fact as to all of these issues.

With respect to where the Idol was found, Christie's and Steinhardt themselves concede that there is at least some evidence of a possible find spot. Indeed, Kulaksizlar, which is located in modern-day Turkey, is the "only known workshop for the production of Kiliya-type idols." Dkt. No. 236-2 ¶ 3; Dkt. No. 202-22 at 77:19–78:2. While Christie's and Steinhardt also point to evidence that Kiliya-type idols traveled around the eastern Mediterranean during the era of their manufacture, Dkt. No. 202-44 at 4, and thus, even if manufactured within Turkey, this specific Idol could have been excavated from a site outside Turkey, this evidence only underscores the genuine dispute as to the material fact of the Idol's find spot. Given that the only workshop known to have manufactured Kiliya-type idols is located in Turkey and that, in the opinion of

Turkey's archaeology expert, the Idol at issue here was excavated in Turkey, a reasonable juror could conclude that the Idol was found in modern-day Turkey. Christie's and Steinhardt's suggestion that Turkey must further be able to establish a *specific* find spot—of which, they claim, there is no evidence—in order to sustain its ownership claim has no basis in either the 1906 Decree nor the relevant case law.

There is also a genuine dispute as to the material fact of when the Idol was excavated and ultimately exported. There is undisputed evidence that the Idol was acquired by American collectors in or around 1961. *See* Dkt. No. 231 ¶ 5; Dkt. No. 202-28. Accordingly, the Idol must have been excavated and exported from Turkey prior to that time. While Christie's and Steinhardt argue that Turkey has presented *no* other evidence, either of its excavation date or of its export date, Turkey has indeed put forth evidence from which a reasonable juror could infer that the Idol was excavated and exported while the 1906 Decree was in effect. Turkey offers evidence from its archaeology expert that several other prominent examples of antiquities looted from Turkey appeared on the market, and were acquired by museums or collectors, within a year or two of their looting. Dkt. No. 202-11 at 21–22. Turkey also offers evidence that the Martins, the American collectors who acquired the Idol in 1961, acquired it from J.J. Klejman Gallery, Dkt. No. 202-28, and that J.J. Klejman was a well-known "dealer-smuggler" who sold looted art in the 1960s, *see* Dkt. No. 232 ¶ 41; *see also, e.g.*, Dkt. No. 237-1 at 170:25–171:15; Dkt. No. 202-10 at 27–28. From this evidence, a reasonable juror could conclude that the Idol, which was in the hands of American collectors by 1961, was excavated and exported from Turkey shortly before then, while the 1906 Decree was in effect.

Christie's and Steinhardt's reliance on *Gov't of Peru v. Johnson*, 720 F. Supp. 810 (C.D. Cal. 1989) to support their argument that the evidence Turkey offers here is insufficient to

survive summary judgment is misplaced, because it ignores the fact that that opinion was issued *after* a trial. In *Peru*, the court, acting as fact-finder, weighed the evidence, assessed the credibility of witnesses, and ultimately determined that the Government of Peru had not met its burden to establish that the antiquities were excavated and exported from Peru while the relevant law was in effect. *See Peru*, 720 F. Supp. 810 at 812–814. On summary judgment, however, this Court may not "weigh evidence or assess the credibility of witnesses." *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996). Where, as here, there are genuine disputes of material fact, that task is left to the fact finder following trial.

Because Turkey, the non-moving party upon whom the burden falls at trial to prove its conversion and replevin claims, has "come forward with specific evidence demonstrating the existence" of several genuine disputes of material fact, Christie's and Steinhardt are not entitled to summary judgment. *Brown*, 654 F.3d at 358. Accordingly, their summary judgment motion is DENIED.

## V.     TURKEY'S MOTION FOR SUMMARY JUDGMENT

Turkey argues that it is entitled to summary judgment on Christie's and Steinhardt's tortious interference with contract and tortious interference with prospective economic advantage claims. The Court agrees.

### A.     Tortious Interference with Contract

"Under New York law, the elements of tortious interference with contract are (1) 'the existence of a valid contract between the plaintiff and a third party' (2) the 'defendant's knowledge of the contract'; (3) the 'defendant's intentional procurement of the third-party's breach of the contract without justification'; (4) 'actual breach of the contract'; and (5) 'damages resulting therefrom.'" *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401-02 (2d. Cir. 2006)

(quoting *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1375 (N.Y. 1996)). By its very nature, "[t]here is no cause of action for inducing breach of a contract where there is no contract in existence at the time of the wrongful interference." 72 N.Y. Jur. 2d Interference § 13; *Avant Graphics Ltd. V. United Reprographics*, 252 A.D.2d 462, 463 (1st Dep't 1998) (dismissing a tortious interference with contract claim because "plaintiff had no contract with either [defendant] at the time of the purported interference").

Even assuming a valid contract was formed between Christie's and the High Bidder when the High Bidder placed the highest bid, Turkey is entitled to summary judgment on Christie's and Steinhardt's tortious interference with contract claim because no reasonable juror could find that the few instances of alleged interference that *post-date* the formation of that contract constitute "intentional procurement of the third-party's breach of the contract without justification." *Kirch*, 449 F.3d at 401-02. Christie's and Steinhardt allege six instances of "wrongful interferences": (1) the full-page advertisement that ran in the *New York Times* on the morning of the auction; (2) the demonstration that Turkey allegedly instigated on the day of the auction; (3) the press statement made by Turkey's Minister of Culture and Tourism on the day of the auction that stated that the Idol had been "abducted"; (4) "Turkey's continuing efforts after the auction to learn the identity of the Bidder"; (5) Turkey's alleged failure to use due diligence to assess the merits of its claims prior to filing this litigation, including its disregard for internal recommendations from its Anti-Smuggling Unit regarding filing suit; and (6) Turkey seeking allegedly "harassing" discovery from third parties throughout this litigation. *See* Dkt. No. 224 ¶¶ 58–84. However, with the exception of Turkey's continued efforts to learn the identity of the High Bidder and the allegedly harassing discovery it sought from third parties, Christie's and Steinhardt do not point to evidence that any of the above instances post-dated the High Bidder's

bid—and thus the formation of the contract that forms the basis of their tortious inference claim. Accordingly, the Court only considers these two instances of alleged interference. In order for these alleged interferences to amount to the "intentional procurement of the third-party's breach of the contract without justification" necessary for a tortious interference with contract claim, they "must be intentional, not merely negligent or incidental to some other, lawful, purpose." *Alvord & Swift v. Stewart M. Muller Const. Co.*, 46 N.Y.2d 276, 281 (1978).

Turkey is entitled to summary judgment on this claim because Christie's and Steinhardt have failed to produce evidence—and instead rely solely on "unsubstantiated allegations or assertions"—that these alleged interferences were anything more than incidental to advancing this litigation. *Id.* at 281–82 (affirming grant of defendant's motion for summary judgment where plaintiff was "obliged to produce evidence, not just unsubstantiated allegations or assertions," but failed to do so).

Christie's and Steinhardt's argument that Turkey's actions with respect to the High Bidder amount to "intentional procurement of the third-party's breach of the contract without justification" are built only on "unsubstantiated speculation." Indeed, Turkey's continuing efforts to identify the High Bidder were previously approved by this Court's Order dated July 26, 2017, which found Turkey had made "a reasonable case that the Bidder might have relevant information." *See* Dkt. No. 62. Accordingly, no reasonable juror could conclude that these efforts were an intentional effort to induce breach without justification rather than incidental to the lawful purpose of pursuing its claims.

Christie's and Steinhardt are similarly unable to point to any "specific evidence" suggesting that Turkey's pursuit of third-party discovery amounts to an intentional procurement of breach without justification. In support of this argument, they point only to evidence that the

third-parties from whom Turkey sought discovery objected to its requests as outside the proper scope of discovery. *See* Dkt. No. 224 ¶ 85. However, such disputes are a common feature of discovery, and any attempt to infer from them a harassing purpose—let alone an attempt to induce a breach of contract by a third-party—is "unsubstantiated speculation." Based on the record before the Court, no reasonable juror could conclude that the third-party discovery Turkey sought was anything other than incidental to the lawful purpose of advancing this litigation. Accordingly, Turkey's motion for summary judgment on Christie's and Steinhardt's tortious interference with contract claim is granted.

### B. Tortious Interference with Prospective Economic Advantage

Under New York law, to prevail on a claim of tortious interference with prospective economic advantage, also known as tortious interference with business relations, a plaintiff must show "(1) [the plaintiff] had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." *Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir. 2003). "[A] claim for tortious interference with [prospective economic advantage] requires a plaintiff to show, 'as a general rule,' that 'the defendant's conduct . . . amount[ed] to a crime or an independent tort.'" *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 262 (2d Cir. 2015) (quoting *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190 (2004)). New York courts have recognized only one exception to this rule "where a defendant engages in conduct for the *sole* purpose of inflicting intentional harm on plaintiffs," and this exception is a narrow one. *Id.* (emphasis added) (internal quotation marks omitted). "When a defendant has acted with a permissible purpose, such as 'normal economic self-interest,' wrongful means have not been shown, even if the defendant was 'indifferent to the [plaintiff's] fate.'" *Id.* (quoting *Carvel Corp.*, 3 N.Y.3d at 190). The New York Court of Appeals has not decided "whether any other exceptions to the general rule exist[]," but has suggested that employing "wrongful means," including "physical violence, fraud

or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure," may constitute an additional exception. *See Carvel Corp.*, 3 N.Y.3d at 190–92.

Christie's and Steinhardt do not allege that Turkey's conduct amounted to a crime or an independent tort, and Turkey's clear interest in recovering the Idol vitiates any argument that it acted for the "sole purpose of inflicting intentional harm on plaintiffs." *Merkin*, 791 F.3d at 262. They nonetheless argue that Turkey is not entitled to summary judgment on the tortious interference with prospective economic advantage claim because there are genuine disputes of material fact with respect to whether Turkey employed "wrongful means" to interfere in Christie's and Steinhardt's prospective economic relationship with the High Bidder. Even assuming that a "wrongful means" exception exists, there is no evidence that Turkey employed wrongful means here. The only action of Turkey that Christie's and Steinhardt point to that could constitute wrongful means if proved is its alleged initiation of "meritless litigation." *See Carvel Corp.*, 3 N.Y.3d at 192. However, for the reasons discussed above, this litigation is not meritless as a matter of law, notwithstanding any statements of Turkey's Anti-Smuggling Unit to the contrary. Accordingly, Turkey is also entitled to summary judgment on Christie's and Steinhardt's tortious interference with prospective economic advantage claim.

## VI.   TURKEY'S *DAUBERT* MOTION

The party seeking to introduce expert testimony "bears the burden of establishing its admissibility by a preponderance of the evidence." *Baker v. Urban Outfitters, Inc.,* 254 F. Supp. 2d 346, 353 (S.D.N.Y. 2003). Federal Rule of Evidence 702 allows expert testimony if:

> (a) the expert's…specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

In evaluating expert testimony under this standard, the court acts as a gatekeeper to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert,* 509 U.S. at 597. However, where, as here, a bench trial is anticipated,

arguments to exclude expert testimony under *Daubert* "are essentially asking [the Court] to gate-keep expert testimony from [itself]." *Joseph S. v. Hogan*, 2011 WL 2848330, at *2 (E.D.N.Y. July 15, 2011). Under these circumstances, unless the disputed evidence is wholly irrelevant or so speculative as to have no probative value, it is appropriate for the Court to "take in the evidence freely and separate helpful conclusions from ones that are not grounded in reliable methodology." *Id.* at *3; *accord In re Salem*, 465 F.3d 767, 776–77 (7th Cir. 2006).

The Court will thus reserve judgment on Turkey's *Daubert* motion—the outcome of which has no bearing on the parties' summary judgment motions—in order to permit the challenged evidence to be admitted at trial subject to the opportunity for cross-examination. It will "deci[de] after the evidence is presented whether it deserves to be credited by meeting the requirements of *Daubert* and its progeny." *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 457, 457 n.l (S.D.N.Y. 2007) (noting that, "[i]n the context of a bench trial where there is not a concern for juror confusion or potential prejudice, the court has considerable discretion in admitting the proffered testimony" and making any necessary *Daubert* determinations after).

## VII. SEALING REQUESTS

Finally, the parties have made various requests to file briefing papers and exhibits associated with these motions with redactions or entirely under seal. *See* Dkt. Nos. 187, 193, 219, 229, 239, 242. The bases for these applications are that their filings include documents and testimony designated as Confidential or Outside Attorneys' Eyes Only under the Protective Order entered in this case at Dkt. No. 78. For the reasons discussed below, the Court finds that these significantly overbroad requests are without justification.

The documents at issue here are "judicial documents" for purposes of the framework for evaluating sealing requests set forth by the Second Circuit in *Lugosch v. Pyramid Co. of*

*Onondaga*, 435 F.3d 110 (2d Cir. 2006). *See also Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 512 (S.D.N.Y. 2015) (treating filings relating to *Daubert* motions as judicial documents for purposes of the *Lugosch* analysis). Furthermore, having carefully reviewed the documents' contents, the Court determines that there is a significant presumption of access to the subject information under both the common law and the First Amendment. *See Lugosch*, 435 F.3d at 121 ("[D]ocuments submitted to a court for its consideration in a summary judgment motion are—as a matter of law—judicial documents to which a strong presumption of access attaches, under both the common law and the First Amendment."); *Louis Vuitton*, 97 F. Supp. 3d at 510 ("[T]he relevant documents [including those related to *Daubert* motions] are 'judicial documents' subject to a common law and First Amendment presumption in favor of public access.").

However, some redactions and limited sealing may nevertheless be appropriate if the parties can make a sufficient showing to overcome the presumption of access. *See Utica Mut. Ins. Co. v. Munich Reinsurance Am., Inc.*, 2017 WL 9400673, at *3 (N.D.N.Y. Jan. 6, 2017) ("Having concluded that both the common law and First Amendment provide a right of access to the documents, the Court must consider whether countervailing factors outweigh the presumption of access and whether continued sealing is justified under 'the more stringent First Amendment framework.'") (quoting *Lugosch*, 435 F.3d at 124). The parties are advised that "the mere existence of a confidentiality agreement covering judicial documents is insufficient to overcome the First Amendment presumption of access." *Aioi Nissay Dowa Ins. Co. v. Prosight Specialty Mgmt. Co., Inc.*, 2012 WL 3583176, at *6 (S.D.N.Y. Aug. 21, 2012) (internal quotation marks omitted).

Though continued sealing may be justified, the parties have not provided the Court with any justification beyond the existence of the Protective Order for the broad sealing that they seek, making it impossible for the Court to weigh the countervailing interests. Accordingly, the parties' motions for sealing are hereby DENIED without prejudice. Within ten business days of the date of this Order, the parties may resubmit narrowly tailored proposed redactions. In addition, the parties shall support their applications for redactions and/or sealing with authority and articulated reasoning that is *specific to the content that they seek to keep under seal*. If no further application is made within this time frame, the unredacted materials must be filed on the public docket.

## VIII. CONCLUSION

For the reasons stated above, the Court DENIES Christie's and Steinhardt's motion for summary judgment, GRANTS Turkey's motion for summary judgment, and RESERVES JUDGMENT on Turkey's *Daubert* motion. The Court also DENIES the parties' sealing requests without prejudice to refiling within ten business days of the date of this Opinion and Order. This resolves Dkt. Nos. 187, 190, 193, 194, 196, 219, 229, 239, and 242. Furthermore, because the Court resolves these motions on the papers, the parties' requests for oral argument on these motions, Dkt. Nos. 199, 204, 235, 242, are hereby DENIED.

Because it arguably contains reference to information that the parties have requested be maintained under seal, this Opinion and Order shall be filed under TEMPORARY SEAL. The parties are directed to meet and confer and to advise the Court in writing within ten business days of this Opinion and Order whether they believe that any portion should be redacted prior to its public docketing. They must also provide the Court with reasoned justification for any redactions they believe are necessary.

A status conference is hereby scheduled in this matter for October 25, 2019 at 10 a.m. By October 18, 2019, the parties shall submit a joint letter proposing trial dates and a briefing schedule for the pretrial materials described in Rule 6 of the Court's Individual Practices in Civil Cases. The parties shall also provide the Court with an estimated length of trial and a status update with respect to any settlement discussions.

SO ORDERED.

Dated: September 20, 2019
New York, New York

_____
ALISON J. NATHAN
United States District Judge