**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- x

REPUBLIC OF TURKEY,                              :
                                                 :
       Plaintiff-Counterclaim Defendant,     :
                                                 :
                                                 :   Case No.:  17-Civ. 3086 (AJN)
    v.                                    :
                                                 :
CHRISTIE'S, INC.,                                :
                                                 :
      Defendant,                       :
                                                 :
MICHAEL STEINHARDT,                              :
                                                 :
      Defendant-Counterclaimant,       :
                                                 :
ANATOLIAN MARBLE FEMALE IDOL OF                  :
KILIYA TYPE,                                     :
                                                 :
      Defendant-in-rem.                :

---------------------------------------------------------------- x


# PLAINTIFF'S PRETRIAL MEMORANDUM OF LAW

HERRICK, FEINSTEIN LLP
2 Park Avenue
New York, New York 10016
(212) 592-1400 (Phone)
(212) 592-1500 (Fax)

*Attorneys for Plaintiff Republic of Turkey*



Lawrence M. Kaye, Esq.
Victor J. Rocco, Esq.
Howard N. Spiegler, Esq.

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................ii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF  FACTS .................................................................................................... 2

I.      Introduction........................................................................................................... 2

      A.      Factual Background Prior to the Commencement of This Action........................ 2

      B.      Christie's Admissions Concerning the 1906 Ottoman Decree ............................ 9

      C.      Turkey's Enforcement of Its Antiquities Laws and Its Diligence
           in Bringing This Action ....................................................................... 10

      D.      The Idol Was Unearthed in and Removed from Turkey...................................... 13

      E.      The Idol Was Illegally Removed from Turkey in the 1960s ............................ 15

      F.      The Conduct of Defendants and the Prior Possessors When
           Acquiring the Idol .................................................................................. 15

ARGUMENT ....................................................................................................................... 24

I.      This Court Has Conclusively Determined Several Legal Issues ................................... 24

II.     Turkey Will Prove All of the Elements of Its Claims.................................................... 26

      A.      Turkey Will Prove that the Idol Was Found Within
           and Removed from Turkey ..................................................................... 28

      B.      Plaintiff Will Prove that the Idol Was Found in Turkey
           During the Period that the 1906 Decree Was in Effect....................... 30

III.    Defendants' Conduct Bars Their Laches Defense and Defendants
       Will Fail to Meet Their Burden to Prove This Defense.................................. 32

CONCLUSION.................................................................................................................... 42

## **TABLE OF AUTHORITIES**

**Page**

### **Federal Cases**

*666 Drug, Inc. v. Tr. of 1199 SEIU Health Care Emps. Pension Fund,*
12-CV-1251, 2013 WL 4042614 (S.D.N.Y. Aug. 8, 2013),
*aff'd,* 571 F. App'x 51 (2d Cir. 2014)..............................................................................35, 39

*Airlines Reporting Corp. v. S & N Travel, Inc.,*
58 F.3d 857 (2d Cir. 1995)..............................................................................................33

*Aris-Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.,*
792 F. Supp. 969 (S.D.N.Y.), *aff'd,* 983 F.2d 1048 (2d Cir. 1992)..................................32, 33

*Arkwright-Bos. Mfrs. Mut. Ins. Co. v. Truck Ins. Exch.,*
979 F. Supp. 155 (E.D.N.Y. 1997), *vacated in part sub nom. on other*
*grounds,* 173 F.3d 843 (2d Cir. 1999) ............................................................................32

*Brown v. Mitchell-Innes & Nash, Inc.,*
2009 WL 1108526 (S.D.N.Y. April 24, 2009) ...................................................................39

*Deweldon, Ltd. v. McKean,*
125 F.3d 24 (1st Cir. 1997)..............................................................................................39

*Keystone Driller Co. v. General Excavator Co.,*
290 U.S. 240 (1933)........................................................................................................33

*Mason v. Jamie Music Pub. Co.,*
658 F. Supp. 2d 571 (S.D.N.Y. 2009)..............................................................................38

*Pavers & Rd. Builders Dist. Council Pension Fund by Montelle*
*v. Nico Asphalt Paving, Inc.,*
248 F. Supp. 3d 374 (E.D.N.Y. 2017) ............................................................................35, 39

*PenneCom B.V. v. Merrill Lynch & Co.,*
372 F.3d 488 (2d Cir. 2004)............................................................................................34

*Schoeps v. Museum of Modern Art,*
594 F. Supp. 2d 461 (S.D.N.Y. 2009)..............................................................................34, 35

*Sotheby's, Inc. v. Shene,*
2009 WL 762697 (S.D.N.Y. March 23, 2009) ...................................................................37

*United States v. Portrait of Wally,*
2002 WL 553532 (S.D.N.Y. Apr. 12, 2002)......................................................................32, 39

*United States v. Schultz*,
    333 F.3d 393 (2d Cir. 2003)............................................................................26, 28

*Vineberg v. Bissonnette*,
    529 F. Supp. 2d 300 (D.C.R.I. 2007), *aff'd*, 548 F.3d 50 (1st Cir. 2008)..............................37

## <u>State Cases</u>

*In re Flamenbaum*,
    22 N.Y.3d 962 (2013) ............................................................................37, 38

*Reif v. Nagy*,
    175 A.D.3d 107 (1st Dep't 2019) ..................................................................37

*Solomon R. Guggenheim Found. v. Lubell*,
    153 A.D.2d 143 (1st Dep't 1990), *aff'd*, 77 N.Y.2d 311 (1991) ...........................32, 34, 37, 39

## <u>Statutes</u>

Fed. R. Civ. P. 44.1...................................................................................28

The Republic of Turkey (the "Republic" or "Turkey") respectfully submits this pretrial memorandum pursuant to this Court's Individual Practices in Civil Cases Rule 6.C in advance of the trial (currently adjourned *sine die*).  For the reasons discussed herein, Plaintiff will establish all of the elements of its claims and Defendants' defenses will fail factually and as a matter of law. Accordingly, Plaintiff's requests for relief should be granted in their entirety.

## PRELIMINARY STATEMENT

Turkey commenced this action to recover an invaluable piece of its cultural property (the "Idol"), a rare and ancient artifact that was looted from its territory in violation of its antiquities ownership law.  Defendants tried and failed to have this case dismissed on the pleadings, then by summary judgment by, *inter alia*, challenging the validity of that ownership law and alleging that the action was untimely under the relevant statute of limitations.  As a result, the Court has conclusively determined several legal issues that will govern this case and do not need to be relitigated at trial.  *See* Opinion and Order so ordered on September 30, 2019 (the "Opinion and Order" Dkt. No. 285).

As for the remaining issues, Turkey will present factual and expert testimony that will prove its claims in their entirety.  For their parts, Defendants offer no credible evidence to refute the overwhelming circumstantial evidence offered by the Republic that, in violation of Turkey's state ownership law, in the 1960s, the Idol was illegally excavated in Turkey, removed from Turkey and brought to the U.S., where it was acquired shortly thereafter by Alastair Martin, a renowned collector of antiquities.  Instead of evidence, Defendants rely on pure surmise and baseless speculation to urge that the Idol may have been found elsewhere, outside of Turkey and at a time when Turkey did not own newly discovered antiquities found within its borders.  Distilled to its essence, their defense is an empty protest: "anywhere but Turkey," the historic and only

1

known home of all Kiliya-type figurines.  Moreover, Turkey will show that Defendants' conduct

when acquiring the Idol, and their disparagement of foreign ownership laws like Turkey's, and

callous disregard for the provenance of the Idol, demonstrate that they eschewed vigilance, have

not been prejudiced by any delay and come into this Court with unclean hands.  As a result, besides

being unable to satisfy their burden of proof of all of the elements of laches, and as we argue at

greater length, in an accompanying motion *in limine* dated April 24, 2020 (the "Motion *In

Limine*"), Defendants should be barred from asserting this equitable defense in this case.

## STATEMENT OF FACTS

### I.     Introduction

The subject matter of this action, the Defendant-in-rem, is an Anatolian marble female idol

of Kiliya-type, currently in the possession of Defendant Christie's, Inc. ("Christie's"), having been

consigned to it for auction by Defendant Michael Steinhardt ("Steinhardt").  The Republic claims

ownership of the Idol and seeks its return to Turkey.  (Opinion and Order at 2, 3)

The testimony and documentary evidence expected to be introduced at trial will establish

the following material facts.

### A.   Factual Background Prior to the Commencement of This Action

In or around 1961, Alastair and Edith Martin (the "Martins") acquired the Idol for

$12,500.00.  This is the earliest known provenance for the Idol and means that it must have been

excavated and removed from Turkey prior to that time.  In fact, there is no prior record of its

discovery or ownership and Defendants have never offered or suggested anything to the contrary.

One thing is certain, and that is that this ancient and very valuable object did not materialize from

nowhere.  The Martins acquired the Idol from J.J. Klejman Gallery, a New York gallery.  Alastair

Martin selected the Idol from a "group" of "several" Kiliya figurines he was offered at the time by

2

J.J. Klejman ("Klejman").  Klejman is long dead but during the 1960s, he had a reputation as a favorite "dealer-smuggler" among his customers, like the Metropolitan Museum of Art ("the Met"), to which he sold looted antiquities.  Although Klejman's specialty was in antiquities from Syria and Lebanon, he was well-known for dealing in looted Turkish antiquities.  The best known of these antiquities, the "Lydian Hoard," was returned to the Republic in 1993 by the Met, after years of a very public litigation (from 1987 to 1993), because they had been looted from Turkey.

Kulaksizlar, located in modern-day Turkey, is the home of the only workshop known to have produced Kiliya-type idols.  The Kulaksizlar workshop dates to the third quarter of the fifth millennium BC, specifically in or around the later Middle Chalcolithic period in Turkey (4500–4300 BC).  The Idol is an extremely rare artifact.  It belongs to a Kiliya figurine tradition that is distinctive to Anatolia, which is entirely contained within the modern boundaries of Turkey.  Looting of ancient sites in Kulaksizlar was widespread in the 1960s.

There is no record that the Idol ever belonged to anyone, including a museum or an inventoried collection, before the Martins' acquisition of the Idol from Klejman.  The Martins thus purchased it with no record of prior ownership – so the only known provenance for this six-thousand-year-old treasure begins in 1961.  The only known written provenance for the piece, which was authored and published by Christie's for its auction sale catalogue in 2017, inexplicably coincides with the year it was first loaned to the Met, not five years earlier when it was purchased by the Martins.  In 1966, the Martins loaned the Idol, a part of their so-called "Guennol Collection," to the Met.  The Met accepted the piece from the Martins with no record of ownership before 1961 when the Martins bought the Idol from Klejman.  Alastair Martin sat on the board of trustees of the Brooklyn Museum and in 1968, was elected an honorary trustee of the Met and served until

3

1992, and acted in an advisory role on the Met's acquisitions committee from 1984 to 1992.  He maintained a close relationship with the Met for many years.

In 1983, the Martins removed the Idol from their Guennol Collection and transferred it to Buttercup Beta Corporation, owned by their son, Robin Martin, and his children.  Between 1966 and 1993, the Idol was on loan to the Met, and in 1993, it was returned to Robin Martin following his request.   An annotated volume of the collection catalogue, published as *The Guennol Collection*, (Volume 2, The Metropolitan Museum of Art, New York 1982), in Alastair Martin's personal archives located at the Brooklyn Museum, contains the following handwritten annotation alongside the entry for the Kiliya Idol: "1990 Turkey may present a problem here, be careful."

Within a month after Robin Martin received the Idol back from the Met, on July 16, 1993, the Merrin Gallery, a New York antiquities dealer, acquired it from Buttercup Beta Corporation.  Steinhardt and his wife, in turn, jointly acquired the Idol from the Merrin Gallery for $1,500,000 on or around August 16, 1993.  Before acquiring the Idol, Steinhardt received a fax from the Merrin Gallery, which contained an essay by Prudence Harper, then of the Met, stating that the Idol was of a class of figurines "found" in Anatolia.  Steinhardt testified that he considers Prudence Harper's essay to be accurate.

The so-called Judy and Michael Steinhardt Collection loaned the Idol back to the Met in 1999 where it remained until 2007 when it was returned to Steinhardt.  Steinhardt boasts of his decades-long close relationship with the Met, which he describes as "one of [his] particularly favorite institutions" and to which he has contributed substantial sums and loaned various objects over the years.   Since the 1980s or 1990s Steinhardt has been a member of the Met's "Philadorphia" committee (he is apparently referring to the "Friends of Greek and Roman Art: Philodoroi"), which committee advises on the "political circumstances of collecting Greek and

Roman art." He and his wife have also served on the Visiting Committees for the Ancient Near East Department and the Greek and Roman Department since the 1990s and even have an ancient Greek Art gallery at the museum named after them.

On or about March 1, 2017, Steinhardt entered into an agreement with Christie's to consign the Idol for sale. Steinhardt agreed to appoint Christie's as his exclusive agent to sell the Idol by auction. On or about March 2, 2017, Steinhardt consigned the Idol to Christie's for sale; it was delivered to Christie's that same day.

Christie's identified "Turkey" as the Idol's "Country of Origin" in the Provenance and Country of Origin Declaration (which Christie's explicitly advises signatories may be provided to governmental authorities) it prepared on or about March 15, 2017. Steinhardt subscribed to and certified the Declaration on March 23rd. Likewise, in a draft press release announcing the upcoming sale of the Idol at Christie's, which it prepared on or about March 16, 2017, the Idol is identified as coming "from Turkey." The description was subsequently deleted, pursuant to an email from Max Bernheimer ("Bernheimer"), the long-time head of Christie's Antiquities Department, who, in directing the deletion, remarked: "I would remove 'from Turkey'[.] Why poke them in the eye?" Bernheimer, in his direct testimony trial declaration, admits that he said this, but now spins his remark to mean that he only meant that the Idol could have been discovered somewhere else. But that plainly is not what he said. Nor did he offer that simple observation as an explanation at the time and he does not explain why he did not simply say what he meant. More importantly, he does not even try to explain why he used the term "poke them in the eye," why, by identifying the Idol as coming from Turkey, Turkey was being "poke[d] in the eye," or why he wished to avoid possibly letting Turkey know that Christie's was offering an Anatolian antiquity for auction, despite the Idol's obvious and acknowledged Turkish origin. No one from Christie's

5

bothered to simply contact Turkey to ask if there indeed would be a problem if Turkey was mentioned, as Bernheimer had anticipated.  In fact, what Bernheimer meant by his obvious comment is precisely what he feared, and that is that by mentioning Turkey, he would have roused Turkey's suspicions that the Idol was discovered there and belonged to the Turkish state.

Despite Bernheimer's edits, an interdepartmental presentation made at Christie's on or about March 21, 2017 acknowledged that the Idol is the "'Turkish cousin' of the Cycladic (Greek) Schuster Master."  As Bernheimer explained at his deposition, the presentation, which was sent in an email from Christie's Chairman's Office to "all of the regional reps of Christie's that are under [the president of Christie's America's] watch," was "not just from my department, but from other departments that were participating in the sales coming up…."  Bernheimer again identifies the Idol as "originating" in "modern Turkey" in an email sent on or about April 14, 2017.  An email by Alexandra Olsman, a Junior Specialist, Antiquities at Christie's, states that the Idol is of Kiliya-type, and that such idols "originate from Turkey and only Turkey."  Christie's also included an essay about the Idol in its catalogue for the April 28, 2017 auction ("the Auction"), an earlier draft of which recognized that Kiliya type idols are discovered "in Turkey," but that statement was edited to state "in Anatolia."  As published in its final form, the essay explains that "Kiliya refers to a town on the Gallipoli peninsula where the first published example of these idols was discovered," and lists "[o]ther archaeological find-spots" for Kiliya idols "in Turkey."

Christie's conducted provenance research and listed the Idol's provenance as tracing back to "1966 or prior," when it was acquired by the Martins.  Christie's listed the Idol, along with its frugal provenance information, in the catalogue for the Auction as "AN ANATOLIAN MARBLE FEMALE IDOL OF KILIYA TYPE" in a heading using upper-case typeset.  In its standard Conditions of Sale in the same catalogue, Christie's warrants that property described in a heading,

printed in upper case type, and without qualification, is of the period, culture, source or origin described.

Bernheimer now tries as well to re-interpret the catalogue warranty – that the Idol was unearthed in Turkey – by claiming in his declaration for trial that the warranty only suggests where the Idol was manufactured, not found.  He does not explain the other evidence that demonstrates that Christie's knew that the Idol was discovered in Turkey and his attempt at different points, prior to the Auction, to conceal that fact.

Before the auction date, Christie's asked a scholar, whom Defendants' own professed expert described as being "among the world's leading scholars of Neolithic and Chalcolithic statuettes," about the origin of Kiliya-type figures, and her response was: "I have not come across any Kilia [sic] figures that did not come from Turkey."  She did not reference where the figures were made or produced, which would have been easy enough to do and certainly the kind of distinction a scholar would note.  In addition, several publications identified Kiliya-type idols as having been found only in Turkey.  Significantly, none of the Christie's documented references to the Idol ever mentions where the Idol was made.

The Christie's auction catalogue sets forth the Idol's provenance as follows:

Alastair Bradley and Edith Martin, New York, acquired 1966 or prior; thence by descent. with the Merrin Gallery, New York, acquired from the above, 1993.
Acquired by the current owner from the above, 16 August 1993.

The provenance published in the Christie's auction catalogue is not only the first written provenance for the piece; it is the first ever known publicly published provenance for the Idol.

On or about March 24, 2017, Christie's issued a press release about the Idol.  A draft of the press release stated that the Idol is "from Turkey," but that reference was removed from the

press statement that was issued.  Until Plaintiff brought this case, Christie's, and those it consulted, always described the Idol as Anatolian or from Turkey.

Around March 26, 2017, the Republic of Turkey learned about the planned sale of the Idol from an email from a journalist named Özgen Açar that included a link to an ArtDaily news article about the Auction.  On or about March 29, 2017, the General Directorate of Cultural Heritage and Museums (the "General Directorate") forwarded that information to the Province Directorate of Culture and Tourism in Ankara and asked that experts at the Museum of Anatolian Civilizations (the "Museum") in Ankara prepare a report concerning the Idol.  On or about April 3, 2017, the Province Directorate of Culture and Tourism in Ankara forwarded the March 29, 2017 letter from the General Directorate to the Directorate of the Museum, requesting that a report be sent to the Province Directorate.

The report did not take long to prepare.  On April 7, 2017, two archaeological experts at the Museum, Aynur Talaakar and Belma Kulaçoğlu, prepared the report requested by the General Directorate.  On or about April 10, 2017, the Province Directorate received a letter from the Director of the Museum, enclosing the report from the two experts.  On or about April 12, 2017, the General Directorate received a copy of the report.  Based on the available literature on the subject, the report concluded that the Idol originated in Anatolia, confirming Christie's description in its catalogue.

On or about April 13, 2017, the General Directorate wrote to the Ministry of Foreign Affairs and asked that the Ministry contact Christie's.  On April 19, 2017, Ertan Yalcin, then the Consul General at the Turkish Consulate in New York, sent Christie's a letter claiming that the Idol is of Turkish origin, and, as such, is state property protected under Turkish law.  In or around

April 2017, Turkey demanded the return of the Idol from Defendants. This demand by Turkey was refused by Defendants in or around April 2017.

Turkey commenced this action on April 27, 2017. The Idol remains in Christie's custody pending the outcome of this action.

### B.  Christie's Admissions Concerning the 1906 Ottoman Decree

Turkey claims ownership of the Idol under a 1906 Ottoman Decree (the "1906 Decree" or the "Decree').

Max Bernheimer, Christie's Rule 30(b)(6) witness, and admittedly the person who first approached Steinhardt to sell the piece through Christie's, testified at his deposition that in its internal Policy on Cultural Property (the "Policy"), Christie's lists the year 1906 as the "Sensitive Date" for Turkey as a result of Turkey's "Local Legislation." The Policy was in effect at the time the Idol was offered for sale at Christie's. Christie's was required by the Policy to demonstrate with "verifiable information" that the Idol was outside of Turkey before 1906, and, if it could not do so, refer to Christie's Cultural Property Committee, a group of individuals, including attorneys, which establishes guidelines around culturally sensitive issues and helps to ensure that Christie's does not offer illicit objects for auction. Christie's was not able to demonstrate by reference to verifiable documentation that the Idol was outside of Turkey before 1906, but it nevertheless violated its policy, did not refer it to the Cultural Property Committee and proceeded with the sale. When Bernheimer was asked about this irregularity at his deposition, he responded that he would not have to do so and that "[t]here was no need to…", without offering an explanation why he felt it was unnecessary.

Now, in his direct testimony trial declaration, Bernheimer claims that the "sensitive date" is only a date that "a country may argue should be considered as the date by which objects must

9

be out of the country in order for good title to be exchanged, but that Christie's does not necessarily agree." Bernheimer thus argues that Christie's can ignore the local legislation of a country like Turkey and decide that the appropriate "sensitive date" is an arbitrary one – here 1970 – which has nothing to do with Turkey's own laws. Bernheimer never had anyone at Christie's check with Turkey to see if Turkey indeed would "argue" that 1906 was the date of its effective legislation concerning antiquities, despite his own acknowledgement that it was "a poke in the eye." He simply ignored the date in favor of one he contrived. He also never explains how he came to make this decision instead of Christie's Cultural Property Committee as required by the Policy.

**C. Turkey's Enforcement of Its Antiquities Laws and Its Diligence in Bringing This Action**

Although not required to do so, Turkey has presented evidence demonstrating that "the prohibition of private ownership of antiquities under the Decree and domestic enforcement of it [] confirms that the Decree is what it says is – an ownership law." (Opinion and Order at 12-13, citing several examples in the record) Turkey will offer additional, overwhelming evidence at trial, in addition to the examples to which the Court referred, demonstrating enforcement of the Decree, including its prohibition of private ownership.

Thus, Zeynep Boz ("Boz"), now the Acting Director of the Anti-Smuggling Department of the General Directorate in the Ministry of Culture and Tourism of the Republic of Turkey and a former Specialist in the Anti-Smuggling Branch of the Department of Excavations within the Ministry of Culture and Tourism, will detail Turkey's extensive efforts as early as the 1906 Decree and subsequently to investigate the looting of antiquities within Turkey, and the arrest of tens of thousands of suspects in connection with almost as many incidents of looting at antiquity sites. In addition, she will detail a huge number of case studies demonstrating the numerous successful

10

efforts taken by Turkey to recover looted antiquities throughout the world.  As she will explain, the Republic has put in place an elaborate bureaucratic mechanism across several Ministries to enforce its antiquities laws with specific divisions responsible for combatting smuggling and illegal excavations of cultural property and recovering looted antiquities.

Ms. Boz will also explain the enormous task that Turkey faces in trying to enforce its ownership laws.  As she will testify, the country is essentially one big excavation site, and the Republic is responsible for trying to protect all of the objects created over thousands of years that lie buried within its borders.

In addition, Dr. Neil Brodie, the archaeological expert to whom the Court refers in the Opinion and Order, and who is generally recognized as one of the world's foremost experts on the efforts of nations to prevent the looting and smuggling of antiquities found within their borders and to recover already looted and smuggled antiquities, will testify as an expert concerning Turkey's extensive efforts at enforcing its antiquities laws, bearing in mind that there are simply too many ancient sites and too many artifacts to be monitored or adequately protected.  These extensive efforts to enforce its antiquities laws have earned Turkey recognition as a world leader in pursuing the recovery of looted antiquities.  For example, investigative journalists in the journal *Archaeology* stated: "No other country has pursued its plundered heritage as aggressively or as tenaciously" as Turkey.

With this background, Dr. Brodie will testify further that the Christie's Auction in 2017 was the first realistic opportunity that Turkey had to identify the Idol as having been looted from Turkey and to ascertain its location.  Although the Idol had been referenced at times starting in 1964 in academic publications, the references usually occurred as an unillustrated comparison, often in a small-print footnote, sometimes in passing, almost always in a language other than

11

Turkish and never with a description of its provenance.  As Dr. Brodie has concluded, it is unrealistic to expect the Turkish General Directorate to be reading closely in all languages every single academic publication of art and archaeology relating to Turkish territory and beyond, looking for one-line single mentions of an object which nobody knew had been stolen in the first place.  It would be an impossible and fruitless task.

The first major illustrated publication of the Idol was in volume two of the Metropolitan Museum's catalogue, *The Guennol Collection,* published in 1982, where it is described in English by the Met's Prudence Harper as a "Marble Figurine", among the class of figurines found in Anatolia.  There is no reference to the figurine's provenance.  As Dr. Brodie will point out, perhaps Turkey could have noticed it then, if a copy of the catalogue had been available in Turkey, but that was not likely the case, and there is no evidence to suggest to the contrary.  Dr. Brodie will opine that it is unreasonable to expect Turkey to purchase every published museum and/or collection catalogue and archaeological monograph that might (or might not) contain an illustrated description of an object said to have found in Turkey.  Turkey also had no way of knowing that its record of ownership only started in the 1960s.

The balance of the Guennol Collection was sold at public auction at Christie's in 2010, and Turkey might have studied the auction catalogues of this sale, but even if did, it would not have seen the Idol.  It had already changed hands through private transactions on two prior occasions and no longer was part of the collection or belonged to the Martins: first when it was transferred to Buttercup in 1983, and then ten years later when it was sold to Merrin, who, in turn, sold it to Steinhardt in 1993.  There is no public record of these private transactions.  Indeed, there is nothing to suggest that Robin Martin even knew the identity of the party who purchased the Idol from Merrin.

12

Moreover, Dr. Brodie will refer to the common practice in the collecting community for antiquities to be identified by the name of a previous owner – the Elgin Marbles being an obvious example – or previous collection.  Referring to the Idol as the "Guennol Stargazer," whether intentionally or not, serves to disguise current ownership.  It may have been possible to discover the "Guennol Stargazer" via an Internet search, but that would not have located it or identified its provenance.  By the time the Internet was fully operational, with search engines at least, the Idol was no longer in the Guennol Collection or in the possession of the Martins but was in the possession of Steinhardt.  Internet searches would have produced out-of-date and misleading information.  The same point applies to footnote mentions of the Idol in Turkish academic publications of the 1990s, all published after 1993, when Steinhardt bought the Idol, which incorrectly continued to locate the Stargazer in the Guennol Collection of New York, not in the possession of Steinhardt.

Thus, Dr. Brodie will conclude that despite the diligence that Turkey regularly practices in finding and recovering its looted property, for which it has earned general acclaim, it simply could not reasonably have known that the Idol had been looted from Turkey before the Auction, when Christie's first published its suspiciously limited provenance, and Turkey subsequently researched its origin.

### D.  The Idol Was Unearthed in and Removed from Turkey

In addition to Christie's admissions that the Idol was found in Turkey, and its efforts to conceal that fact and subsequent efforts in the course of this litigation to conceal why it did so, Dr. Brodie, Turkey's archaeological expert, will testify, using irrefutable scientific and academic evidence, that the Idol, having been made in Turkey, must have been unearthed in and removed from Turkey.  First, the means of transportation during the Middle Chalcolithic period in Turkey

(when the Idol was manufactured) were very limited.  Indeed, the wheel had not yet been invented.

Also, the proto-urban "trading" communities of the Early Bronze Age were still many centuries in

the future and, in any event, the religious significance of Kiliya-type idols without any utilitarian

purpose would have made them unacceptable objects of trade.  Further, there is no documented

find of a Kiliya-type idol outside of Turkey.  Finally, Klejman was a primary conduit into the

United States for antiquities looted from Turkey, not those from countries neighboring Turkey,

like Greece or Bulgaria, and offered to Alastair Martin his choice of several of these extremely

rare idols when he sold the Idol to him, further suggesting that they had been looted.

To no avail are the efforts in the trial testimony declaration of Maxwell L. Anderson

("Anderson"), Defendants' proffered expert, to burnish Klejman's reputation by touting his

unrelated persecution and privations during the Holocaust and the quality of his Madison Avenue

gallery's window display in 1967, which was discussed in an old review by John Canaday, a former

art critic of the New York Times.  This is especially so when simultaneously absent from

Anderson's direct testimony trial declaration is Klejman's role as a source of the Lydian Hoard

that the Met returned to Turkey at the time of Steinhardt's purchase of the Idol and after years of

a highly publicized litigation.  It is especially ironic that in his praise of Klejman, Anderson would

brush aside the telling comment of former Met Director Thomas Hoving that Klejman was one of

the Met's "favorite dealer-smugglers," when Anderson has described the "methods of collection"

of his mentor and former boss at the Met, Dietrich von Bothmer, as "swashbuckling."  Von

Bothmer was the head of the Department of Greek and Roman Art under Hoving and the person

responsible for buying for the Met the Lydian Hoard from Klejman.  As if all this is not enough to

question Klejman's business tactics and reputation, Steinhardt himself acknowledges that the

14

reputation of all ancient art dealers had a dubious quality to it.  Apparently, all of this sordid, but relevant, detail is lost on Anderson in his assessment of Klejman.

### E.  The Idol Was Illegally Removed from Turkey in the 1960s

Turkey will offer evidence of 12 well-publicized cases of antiquities looted from Turkey that appeared on the market and were acquired by museums or collectors within a year or two of their looting.  Dr. Brodie will confirm that this demonstrates that the Idol was smuggled out of Turkey shortly before the Martins acquired it in the early 1960s, while the 1906 Decree was in effect.  As noted above, Turkey will also offer evidence that the Martins acquired the Idol from a well-known "dealer-smuggler" who sold looted Turkish art, including to the Met, in the 1960s.  In addition, Turkey will present witness statements describing the looting of Kiliya-type idols in the 1960s at Kulaksizlar, the only place where such idols were known to be manufactured.  Dr. Brodie will also testify that he has seen no evidence to suggest that the Idol was removed from Turkey before 1906, and that an object of such rarity and interest would have attracted scholarly notice and publication, of which there was none.

### F.  The Conduct of Defendants and the Prior Possessors When Acquiring the Idol

Dr. Brodie will also offer his expert opinion about the utter lack of reasonable vigilance exercised by Defendants and their predecessors in acquiring the Idol.  Plaintiff also will present excerpts of testimony given at depositions by Defendants that demonstrate quite vividly that, in sharp contrast to the strenuous efforts of Turkey to protect and recover its cultural property, Defendants acted in total and unconscionable disregard of Turkey's ownership law and indications that the Idol was likely looted from Turkey in contravention of such law.  Plaintiff will offer evidence of seizures from the Steinhardt home and elsewhere, ████████████ ████████ by federal and state law enforcement authorities of other ████ foreign antiquities in

15

Steinhardt's possession going back as far as 1995.  Steinhardt even has admitted, under oath, that he would buy ancient artifacts if they appealed to his aesthetic sense, and with no regard to provenance or foreign patrimony laws, as he was prepared to assume the risk of an adverse claim by a foreign state such as Turkey.  (*See* Motion *In Limine* at 2-6, 9-11)

The provisions of the 1906 Decree were repeatedly published in French (then considered the main international language of diplomacy) as early as 1907.  In 1937, the 1906 law was again published in French by the International Museums Office of the League of Nations' International Institute of Intellectual Cooperation (the forerunner of the International Council of Museums and UNESCO).  Anyone in the antiquities trade and any serious collector would have been aware by 1907, or by 1937 at the latest, that Turkey had, at least by 1906, decreed that its newly discovered antiquities were owned by the State.

Moreover, by the late 1960s, accounts of the theft and smuggling of Turkish antiquities were beginning to appear even in the popular press.  Although the 1906 Decree may not always have been specified in these accounts, the term "smuggled" was used repeatedly to describe the trade, which was definitely regarded as illegal.  It was widely known among serious collectors that looting of antiquities sites was a problem in Turkey.

For example, in December 1967, an article in *The* [London] *Times* opened by saying: "Many of the world's leading museums are guilty of encouraging the wholesale looting of archaeological sites in Turkey by buying treasures which they know must have been smuggled out of the country."  The article went on to state that "[u]nder Turkish law the export of antiquities is strictly forbidden" and that "[t]he law against exporting archaeological antiquities from Turkey is an Ottoman one, introduced in 1896."  This article was wrong about the date (1896 rather than 1906) of the relevant Ottoman patrimony law in effect at the time, and silent about the ownership

16

aspects of the law, but the article, in *The Times*, a respected newspaper, does show that in the 1960s the looting of Turkish antiquities was considered to be an issue of public concern, and also that it was publicly understood that Turkish antiquities were being traded in contravention of Turkish law.

The media commentary accompanying several major museum acquisitions of Turkish antiquities during the 1960s confirms a general understanding that material was leaving Turkey illegally.  In 1993, Thomas Hoving, who became director of the Met in 1967, wrote retrospectively about the Lydian Hoard, which was a group of antiquities that Turkey recovered in 1993 from the Met after a well-publicized litigation.  Hoving recalled that during an internal museum meeting held in response to an earlier 1970 complaint by the Turkish government about the Hoard's acquisition, he had said that "[w]e all believe the stuff was illegally dug up" and that "[w]e took our chances when we bought the material."

Thus, by the 1960s, the collecting community was well aware that Turkish antiquities new to the market had arrived there by illegal means.  This awareness eventually caused many museums to formulate and adopt ethical acquisition guidelines.  Certainly, serious collectors such as the Martins should have been aware of the situation – and, indeed, at least by 1990, they were, as shown by the handwritten annotation, "1990 Turkey may present a problem here," in Alastair Martin's personal copy of *The Guennol Collection*.  An earlier 1964 publication of the Norbert Schimmel collection, which mentions the Idol, states that antiquities collecting was generally "hedged . . . with the most stringent of export laws."  The same book stated that the Idol was part of a group "said to have been found [not made] in Kırşehir in Western Anatolia."

The reports in newspapers and books were widely available and aimed at a non-specialist but interested audience. Even if the Martins had studiously avoided reading relevant media

reportage, as experienced owners of such a significant antiquities collection, they must certainly have known that there was a widely recognized problem with the smuggling of stolen antiquities out of Turkey.  They regularly engaged with knowledgeable museum curators.  Alastair Martin sat on the board of trustees of the Brooklyn Museum.  He also had a long and close association with the Met.  In 1966, the Martins loaned the Idol to the Metropolitan Museum where it remained until 1993.  For its part, the Met recognized Martin's longstanding connection to it in 1968 when he was elected an honorary trustee, serving until 1992, acting in an advisory role on its acquisitions committee from 1984 to 1992.  The Martins, in turn, acknowledged their connection to the Met in 1975 when they expressed their "warmest gratitude" to the Met staff.  Alastair Martin undoubtedly would have been aware of the lengthy and very public litigation brought by Turkey against the Met to recover the Lydian Hoard from 1987 to 1993, which coincided with both his tenure as honorary trustee and advisory member of the acquisitions committee.  As noted above, this is made plain in the annotated volume of *The Guennol Collection* (Volume 2, The Metropolitan Museum of Art, New York 1982) in Martin's personal archives that contains the following annotation alongside the entry for the Kiliya Idol: "1990 Turkey may present a problem here, be careful."

Of course, Alastair Martin also was well-placed to learn about the likely source of antiquities sold by J.J. Klejman, one of the sellers of the Lydian Hoard to the Met in the 1960s, and the Idol to the Martins a few years before that.  Thomas Hoving later described Klejman in his memoir as one of his favorite "dealer-smugglers," someone who according to Hoving spoke openly about selling "pillaged" material.  Philippe de Montebello, Hoving's successor at the Met and its director at the time of the Lydian Hoard's return to Turkey in 1993, which was about the same time that Steinhardt acquired the Idol, was quoted at that time as saying, "our own records suggested that some museum staff during the 1960s were likely aware, even as they acquired these

18

objects, that their provenance was controversial." These staff members would have been in post when the Idol was first accepted on loan from the Martins by the Met in 1966. In these circumstances, it is untenable to suggest that the fact of its subsequent loan to the Met would have led the Martins, with their notable connections to the Met, to believe that the Idol had been a legitimate acquisition when they sold it in 1993.

The spare, virtually non-existent provenance of the Kiliya Idol should have been a strong indication that it was looted, or, at the least, of suspicious origin, especially to those who were familiar with it, and in light of the more general controversy surrounding antiquities collecting at the time. Following the Lydian Hoard debacle, the Martins should have been aware that Turkish objects, particularly those bought from Klejman, were highly suspect. Moreover, the fact that Klejman had offered Alastair Martin the opportunity to choose from a group of several extremely rare Kiliya-type idols all at one time, in itself, would have been an indication to an experienced collector that the Idol had been unearthed illegally shortly before it was sold.

The Lydian Hoard case was reported in the mainstream media and sent ripples through the collecting community during the late 1980s and 1990s. The Met acquired some of the 363 looted antiquities comprising the Lydian Hoard from Klejman between 1966 and 1968. In July 1986, Turkey formally requested its return, and on May 29, 1987 filed suit in New York for recovery. After almost six years of litigation, the Met agreed out of court to return the material in September 1993, just as Steinhardt – who even then was close to and active in the Met – was acquiring and paying for the Idol. For anybody in the collecting community who somehow missed the furor during the 1960s and 1970s over Turkish looting, the return of the Lydian Hoard in 1993, twenty-five years after its acquisition, and the intense publicity attending it, should have put them on notice that objects first acquired in the 1960s in contravention of Turkish law were not immune to

19

recovery.  Indeed, the general concern over antiquities looting in the late 1960s, as a global matter, was of such importance that, in 1970, the UNESCO Convention on the Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property was created in response.  The UNESCO Convention was ultimately adopted by the United States in 1983, and by the Republic in 1981.  The decision by the Met to return the Hoard in 1993 publicly acknowledged that its removal from Turkey in the 1960s had been illegal, and thus implied recognition of the 1906 Decree.

According to his deposition testimony in this case, Michael Steinhardt started collecting antiquities in the late 1980s and has amassed a collection of several hundred objects from galleries, dealers and auction houses, with art and antiquities comprising 60% of his total assets.  He clearly understood the risks and dangers involved and has acknowledged it under oath.  In his deposition in this case, Steinhardt testified that "he was prepared to take the risk" that some of the ancient art objects he collected "would have issues of provenance."  As he explained, "would I under certain circumstances purchase things that were fresh from the ground?  Yes. . . Because my overwhelming motivation in buying ancient art was their aesthetics.  And aesthetics had almost nothing to do with provenance."

As Steinhardt further admitted, ███████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████  Steinhardt also explained that he would take the risk even when that risk included that "a governmental body would conclude that this was an object that related to its national patrimony."  He went on to explain that "[t]he reputation of all ancient art dealers was one that had a dubious quality to it . . . They dealt with the finest museums in the world.  But there

20

was this . . . there was this taint over the entire area." Consistent with Steinhardt's testimony that

he sometimes purchased antiquities that were "fresh," ████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████ – a fact that is corroborated

by the repeated seizures and/or forfeiture of foreign antiquities in his collection by state and federal

law enforcement authorities from 1995 ████████████.

Steinhardt also admitted at deposition that he gives short shrift to other countries'

ownership laws, like Turkey's. Although aware of countries' efforts to enforce their cultural

patrimony laws (including Turkey's claim to own the Lydian Hoard and its return to Turkey), he

does not believe that the cultural patrimony laws of other countries should necessitate

"confiscation" of antiquities in the United States or from individual collectors even if those objects

were illegally excavated and taken out of the country in violation of those laws. He explained that

"if a farmer finds - - is tilling his field and he finds an object in his field and brings it to some local

middleman, who then sells it to someone else somewhere else, that might be called looting. But I

don't think that's the proper description." When asked whether this was so "even if under the

ownership laws of that person's country the government declared it the owner of that antiquity

found in the field," Steinhardt responded: "If the object were in the country, I'd say the country

has a good case. If the object is somewhere else and the country is trying to make a case that this

came from their territory, it's a different case." As it turns out, Christie's has the same attitude.

Its Rule 30(b)(6) witness testified at deposition that it was his understanding that absent a

Memorandum of Understanding, that a local legislation in a foreign country would not apply in

the United States.

21

The Lydian Hoard case provides the critical backdrop for Michael Steinhardt's decision to purchase the Kiliya Idol in 1993.  At the time that case was pending, and the general problem of theft and smuggling of Turkish antiquities was widely known in the New York antiquities community, Steinhardt was a New York resident and active in and a generous supporter of the Met (where there is a gallery named after him and his wife), as well as a member, since the 1980s or 1990s, of the museum's Philodoroi committee on Greek and Roman art, which Steinhardt explained at deposition was formed to discuss the "political circumstances of collecting Greek and Roman art."  Indeed, ██████████████████████████████████████████████ a 1996 deposition, in a forfeiture case brought by the government following a seizure in 1995 by the then U.S. Customs Service of another antiquity that had been looted from Italy, which Steinhardt had purchased.  In that deposition, ███████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ █████████████████████████████████████████████

Steinhardt further testified in 1996 that ██████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████  Steinhardt admitted at that time that ████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████  Thus, in his deposition testimony, involving a valuable Italian antiquity, Steinhardt ██████████████

22

████████████████████████████████████████████████

████████████████████████████████████████████████

By 1993, the then popular glossy art-collecting magazine *Connoisseur* had published two important articles on antiquities smuggling out of Turkey that added to what had already been known since the 1960s.  In 1993, a serious antiquities collector would have known that the theft and smuggling of Turkish antiquities had been a problem since at least the early 1960s, and that Turkey was likely to act to recover such smuggled material.  As Steinhardt has admitted, that is a risk, as an investor, that he is prepared to take – indeed apparently cherishes.  Steinhardt is not only a risk-taker, but as the multiple seizures of antiquities in his collection attests, he cultivates his reputation as a risk-taker.

More to the point, Steinhardt admitted at deposition in this case that before he acquired the Idol, he had read an article by a senior curator at the Met in which he had a high level of confidence of its accuracy, in which she stated that the Idol was among a class of figurines "found" in Anatolia.  Indeed, Steinhardt admitted that he probably bought other objects that also originated in Turkey even before he bought the Idol.  He also admitted that he, a Wharton School graduate and trained financial analyst and hedge fund manager, conducted no independent research before he purchased the Idol – this despite the fact that he is aware that there were a group of Kiliya-type idols "maybe from 1950 or 1960" that were "generally assumed to have been found in Anatolia, which is Turkey."

Steinhardt also admitted at his deposition that █████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████        (*See* Motion *In Limine*)

There is additional evidence that starting in the early 1990s, ███████   antiquities, which

23

Steinhardt claimed or claims to have owned, have been seized at different times by federal and state authorities.  Two of those objects, a Sardinian Marble Idol and a Faliscan Black-Glazed Askos, ███████████████████████████████████, in a Christie's ██████ auction, were subject to ownership claims by Italy, withdrawn from sale and later seized ████████████████████████ ███████████████████████████████████.  The Askos was subsequently returned to Italy.

Christie's has auctioned or attempted to auction several antiquities known to have been looted from sites around the world that were subject to a claim of ownership by a foreign sovereign; investigated by, seized by or turned over to a governmental authority; withdrawn from sale; and/or returned to their countries of origin.  In at least one known occasion, Christie's auctioned an artifact that was looted from a Turkish archeological site – the item was later voluntarily returned by the Dallas Museum of Art.

**ARGUMENT**

**I.  This Court Has Conclusively Determined Several Legal Issues**

This Court's comprehensive Opinion and Order determined several legal issues that govern this case.  Plaintiff submits that these legal conclusions, set forth below with citations to the Opinion and Order, comprise the law of the case, have been conclusively established and should not be re-litigated at trial.

Turkey's claims are timely under the applicable statute of limitations.  (Opinion and Order at 10)  New York law applies to all substantive claims and affirmative defenses and Turkish law governs the question of whether Turkey has a property interest in the Idol.  (*Id.*)

Turkey claims ownership of the Idol under the 1906 Decree.  (*Id.*)  The 1906 Decree is determinative of whether Turkey owns the Idol and is the only relevant provision of Turkish law.  (*Id*. at 5, 10-11)  Whether the 1906 Decree is in fact an ownership law – and thus whether Turkey

24

can maintain the conversion and replevin claims it asserts in this action – is a question of the proper

interpretation of foreign law for the Court to decide as a matter of law.  (*Id.* at 11)

In determining whether foreign law vests ownership of antiquities in the state, courts must

look first to the plain language of the relevant law.  (*Id.*)  In this case, the language of the Decree

itself is unambiguous and unequivocally asserts state ownership of the Idol.  (*Id.*)

Article 4 of the 1906 Decree provides that

> [a]ll monuments and immovable and movable antiquities
> situated in or on land and real estate belonging to the Government
> and to individuals and various communities, the existence of which
> is known or will hereafter become known, are the property of the
> Government of the Ottoman Empire.  Consequently, the right to
> discover, preserve, collect and donate to museums the
> aforementioned belongs to the Government.

(*Id.* at 11-12)

The 1906 Decree further defines antiquity as "[a]ny work or any kind of product without

exception, by any and all types of ancient peoples which once existed in or on the lands ruled by

the Ottoman Government, related to fine arts, science, literature, religion and craft."  Thus, by its

plain terms, movable and immovable antiquities found on both public and private lands are "the

property of the Government of the Ottoman Empire" during the time of its existence, and of

modern-day Turkey thereafter.  (*Id.* at 12)  The 1906 Decree remained in effect after the foundation

of the Turkish Republic in 1923.  (*Id.* at 14)[1]

Turkey may also – but is not required to – offer evidence, for example, of the state's active

enforcement of its ownership rights, to confirm the intent of the law.  (*Id.* at 12)  Turkey has

presented evidence that private ownership of antiquities is prohibited under the 1906 Decree, and

---

[1] Plaintiff will offer the declaration of its Turkish legal expert, Dr. Sibel Özel, a Professor of Private International Law, in which she testifies, *inter alia,* that the 1906 Decree is clearly an ownership law, as the Court held.

domestic enforcement of the 1906 Decree confirms that the Decree is what it says it is – an ownership law.  (*Id.* at 13) (citing Dkt. No. 202-9 at 5 (a 1944 case in which the Decree was enforced against a private citizen); Dkt. No. 202-10 at 10-12 (three high-profile attempts by Turkey, all in 1970, while the Decree remained in effect, to recover allegedly looted antiquities); and *id.* at n.3 (a November 3, 1970 article discussing "formal letters [written] to the Boston Museum of Fine Arts, the Met of New York and Dumbarton Oaks Museum, demanding the return of recently acquired objects" and a successful recovery of a statue head from the Cleveland Museum))  Even if the Decree was underenforced (as Defendants incorrectly suggest), these high-profile examples of enforcement by Turkey are probative of the law's intent.  (*Id.* at 13)

If the 1906 Decree were neither widely publicized nor translated into English, that has no impact on the fact that, by its plain terms, it is an ownership law that vests ownership of antiquities in Turkey.  (*Id.* at 14-15)  State ownership pursuant to the 1906 Decree applies to any antiquity unearthed anywhere in Turkey; there is no requirement in the Decree that the precise find spot of an antiquity be ascertained.  (*Id.* at 16, 11-12)[2]

## II.     Turkey Will Prove All of the Elements of Its Claims

As set forth above, the Court has already decided as a matter of law that the 1906 Decree is an ownership law and therefore Turkey can maintain the conversion and replevin claims it asserts in this case.  (*Id.* at 11)  Although the Court also held that Defendants may offer evidence that the law is "'not what its plain language indicates it is,'" (*id.* at 12, *citing United States v. Schultz*, 333 F.3d 393, 401-02 (2d Cir. 2003)), "by, for example, offering evidence that people

---

[2] Defendants' proffered expert's repeated offerings that ownership under the 1906 Decree requires Turkey to establish direct evidence of a Turkish find spot is not only far beyond his claimed expertise, but completely untenable under the law.  Most importantly, it is contrary to this Court's prior determination that direct evidence of a "*specific* find spot" is not necessary.  (Opinion and Order at 16)

within the country may nonetheless legally keep antiquities or that the law is otherwise generally not enforced" (Opinion and Order at 12), the Court held that Defendants had not sufficiently presented any such evidence (*id.* at 13).

Indeed, Defendants will be unable to do any better at trial since no such evidence exists. In support of their summary judgment motion, Defendants could only resort to political attacks upon Turkey's alleged failure to enforce *any* of its laws equitably, based upon the contentions of Defendants' legal "expert," who lacks any independent expertise or experience concerning Turkey's antiquities laws and is therefore the subject of a pending motion by Turkey to disqualify him from testifying as an expert. Defendants have offered no evidence to contradict that Turkey has enforced its law of national patrimony regularly and vigorously for many decades and also, in obvious testament to that fact, has in place an elaborate system of government agencies dedicated to finding and recovering looted antiquities. In his direct testimony declaration, the Defendants' same unqualified "expert" can only point to private ownership *prior* to the 1906 Decree and gifts sent abroad by the Sultan during the time of the Ottoman Empire, neither of which demonstrates that the law is not an ownership law or that private ownership was permitted under the 1906 Decree. The expert's further contention that Turkey's enforcement efforts were not foolproof only underscores the enormous task it faced and how successful Turkey's enforcement efforts have been.

Although not required to do so, Turkey has presented evidence demonstrating "the prohibition of private ownership of antiquities under the Decree and domestic enforcement of it that confirms that the Decree is what it says is – an ownership law." (*Id.* at 12-13, citing several examples in the record) Turkey will offer additional, overwhelming and irrefutable evidence at

trial, as outlined above, in addition to the examples to which the Court referred, demonstrating enforcement of the Decree, including its prohibition of private ownership.

As this Court has held on summary judgment, the only arguments put forth by Defendants in the face of the "high-profile examples of enforcement" shown by Turkey (*id.* at 13) – that the 1906 Decree did not remain in effect after the foundation of the Turkish Republic in 1923, and that it was neither widely publicized nor translated into English – "is insufficient to overcome the combination of Turkey's evidence and the plain language of the Decree, which makes clear that the Turkish government claims ownership of all antiquities found in Turkey after 1906." (*Id.* at 13-15 (citing *Schultz*))  Defendants' arguments to the contrary have been put to rest as law of the case by the Court's interpretation of foreign law pursuant to Fed. R. Civ. P. 44.1 (*id.* at 11) and should not be relitigated at trial.

Having established that the 1906 Decree clearly provides that the Turkish state owns all antiquities discovered in Turkey after 1906, the remaining elements that Turkey needs to prove at trial is "[a] that the Idol was found within and exported from the boundaries of modern-day Turkey [b] while the Decree was in effect." (*Id.* at 15)  As shown in the Statement of Facts, *supra*, Turkey will present unassailable evidence to prove these elements.

### A. Turkey Will Prove that the Idol Was Found Within and Removed from Turkey

As summarized above, Turkey's archeological expert will offer his expert opinion that the Idol was excavated in Turkey.  As the Court held, "given that the only workshop known to have manufactured Kiliya-type idols is located in Turkey," Turkey's expert testimony would be sufficient for the finder of fact to "conclude that the Idol was found in modern-day Turkey." (*Id.* at 15-16)  The Court further held that Defendants' "suggestion that Turkey must further be able to

establish a *specific* find spot . . . in order to sustain its ownership claim has no basis in either the 1906 Decree nor the relevant case law." (*Id.* at 16 (emphasis in original)) Thus, Turkey's burden at trial is only limited to the proof concerning whether the Idol was found somewhere in modern-day Turkey. Defendants' repeated entreaties that a direct find-spot is required to establish a *prima facie* case are both baseless and to no avail.

In fact, the evidence that the Idol was unearthed in Turkey is extensive and indisputable. First, Christie's has repeatedly admitted this to be the case, notwithstanding its deliberate efforts to obfuscate or conceal that fact and the reasons why it chose to do so. Christie's catalogue for the auction of the Idol, for example, includes a description of it as "AN ANATOLIAN MARBLE FEMALE IDOL OF KILIYA TYPE," in a heading using upper case typeset. In its standard Conditions of Sale, Christie's warrants that property described in a heading, printed in upper case type, and without qualification – such as the afore-mentioned description of the Idol – is of the period, culture, source or origin described. Thus, Christie's has not only admitted but warranted that the Idol originated in Anatolia*, i.e.,* within the borders of modern-day Turkey, and consciously sought to conceal that fact. Second, the opinion of a scholar whom Christie's contacted, and whom Defendants' own expert describes as being "among the world's leading scholars of Neolithic and Chalcolithic statuettes," is that: "I have not come across any Kilia [sic] figures that did not come from Turkey." Her opinion is unambiguous that Kiliya-type figures "come from Turkey" and that Christie's knew it before the Auction as, for example, its own Provenance and Country of Origin Declaration shows. Third, Christie's considered the Idol, as a Kiliya-type idol, to be the "Turkish cousin" of Cycladic (Greek) idols, and the head of its Antiquities Department and its specialist identified the Idol as well as Kiliya-type idols generally as originating only in Turkey. Finally, several other publications identified Kiliya-type idols as having been found only in Turkey.

Indeed, in order to ascertain whether the Idol being auctioned at Christie's was discovered in Turkey, Turkish government experts came to that very conclusion based on the available literature on the subject and did so quickly.   Any serious diligence by Christie's would have led it to the same conclusion.

Most significantly, Dr. Brodie, an archaeologist by education and training and a Senior Research Fellow in the School of Archaeology at the University of Oxford, will provide comprehensive scientific evidence for his conclusion that the Idol was almost certainly found in Turkey, as summarized above.  In sharp contrast to Dr. Brodie's testimony, Defendants have not designated any archaeologist expert and instead have offered to the contrary only the baseless speculations of Anderson, an art historian, whose career has been primarily spent as a museum director, who has nevertheless opined on matters concerning archaeology well outside of his expertise.  As a result, Plaintiff has separately moved to have him disqualified with respect to such matters, which is pending before the Court.

**B.  <u>Plaintiff Will Prove that the Idol Was Found in Turkey During the Period that the 1906 Decree Was in Effect</u>**

The Court has held that the evidence that Turkey presented in response to Defendants' summary judgment motion was sufficient for a reasonable fact finder to "conclude that the Idol, which was in the hands of American collectors by 1961, was excavated and exported from Turkey shortly before then, while the 1906 Decree was in effect."  (Opinion and Order at 16)  Defendants have not offered any evidence to suggest anything to the contrary, relying instead solely on self-serving surmise and baseless speculation to attack the sufficiency of Turkey's uncontradicted and compelling circumstantial evidence.

The Court referred in its decision on summary judgment specifically to the evidence Turkey proffered on the motion: "Turkey offers evidence from its archaeology expert that several other prominent examples of antiquities looted from Turkey appeared on the market, and were acquired by museums or collectors, within a year or two of their looting.  Turkey also offers evidence that the Martins, the American collectors who acquired the Idol in 1961, acquired it from the J.J. Klejman Gallery, and that J.J. Klejman was a well-known 'dealer-smuggler' who sold looted art in the 1960's."  (*Id.* at 16) All of this supports the conclusion that the Idol was smuggled out of Turkey shortly before the Martins acquired it in the early 1960s.  (*Id.*)  Klejman's reputation as a looter of Turkish antiquities comports with the dispositive fact that when the Martins acquired the Idol, they were offered their choice of any or all of several Kiliya-type figurines.  The sudden appearance for sale in one place, at one time, by the same dealer – a known looter of Turkish patrimony – of several rare antiquities, is highly probative of the further fact that the Idol was looted from Turkey by Klejman or that Klejman came into possession of it shortly after it was looted.

Turkey will present more extensive evidence at trial to prove this point further, including no fewer than 12 well-publicized cases in which looted antiquities taken from Turkey appeared on the market outside of Turkey shortly after they were looted.  The most notorious of these is the Lydian Hoard which, like the Idol, first surfaced in New York in the 1960s and, also like the Idol, came from Klejman.  Turkey also will present witness statements describing the looting of Kiliya-type idols in the 1960s at Kulaksizlar, the only known place where such idols were manufactured.  That evidence is corroborative not only of the fact that the Idol itself may have been unearthed there and quickly brought to market, but further would explain why later archeological surveys of Kulaksizlar in the 1990s found no examples of intact or nearly intact Kiliya-type figurines – a fact

31

that the Defendants' proffered expert attempts to use to bolster his speculation that Kiliya-type idols were manufactured for "export." Further, Dr. Brodie will testify that there is virtually no chance that the Idol was removed from Turkey before 1906, since discovery of an object of such interest would have attracted notice and publication of which there was none at that time.

In contrast to all of this evidence, Defendants can only argue lamely that Turkey did not present evidence of the actual excavation or export date of the Idol but, as the Court held, in light of the considerable circumstantial evidence that Turkey has presented, it is not necessary that it do so in order to prove its case. (*Id.* at 16)

## III.   **Defendants' Conduct Bars Their Laches Defense and Defendants Will Fail to Meet Their Burden to Prove This Defense**

Defendants have the burden of establishing the defense of laches, and to do so must prove that: (1) Turkey unreasonably delayed in commencing this action, (2) Defendants suffered undue prejudice as a result, and (3) the equities tip in Defendants' favor. *See United States v. Portrait of Wally*, 2002 WL 553532, at *22 (S.D.N.Y. Apr. 12, 2002). In determining the defense of laches, the degree of Defendants' vigilance when acquiring the Idol is as much in issue as Turkey's diligence in commencing this action. *Solomon R. Guggenheim Found. v. Lubell*, 153 A.D.2d 143, 152 (1st Dep't 1990), *aff'd*, 77 N.Y.2d 311 (1991). But, as an initial matter, and as we argue in our accompanying Motion *In Limine* (*see* Motion *In Limine*, Points I-II), Defendants cannot even offer the defense of laches because Turkey will prove that Defendants had unclean hands. *See generally Aris-Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.*, 792 F. Supp. 969 (S.D.N.Y.), *aff'd*, 983 F.2d 1048 (2d Cir. 1992). Moreover, Christie's cannot assert independently the doctrine of laches as a defense because it is a mere stakeholder and has no interest of its own in the Idol or "in the outcome of the litigation." *Arkwright-Bos. Mfrs. Mut. Ins. Co. v. Truck Ins. Exch.*, 979 F.

32

Supp. 155, 161 (E.D.N.Y. 1997), *vacated in part sub nom. on other grounds*, 173 F.3d 843 (2d Cir. 1999), *citing Airlines Reporting Corp. v. S & N Travel, Inc.*, 58 F.3d 857, 862 (2d Cir. 1995). Christie's has no standing to assert a defense that is asserted by its disclosed principal.

As we shall show below, Defendants cannot meet their burden to prove any of the elements of laches.  But most importantly, Steinhardt's own remarkable admissions at his deposition that he has absolutely no concern for Turkey's ownership law or about purchasing stolen cultural property and takes no steps to ensure that he does not do so because he is prepared to take the risk of losing the property, along with the series of corroborating similar acts evidenced by repeated seizures and repatriations of other antiquities in his possession, establish beyond question his unclean hands and bars Defendants from offering a laches defense.  (*See generally* Motion *In Limine*) While Defendants' conduct also demonstrates that they were not in any way prejudiced by their acquisition of the Idol, and that the equities clearly balance in favor of the victim and not the wrongdoers, Steinhardt's testimony can best be analyzed as a quintessential example of unclean hands.  Indeed, his claim that the lack of any meaningful provenance was insignificant because Steinhardt knew that the Idol had been on loan to the Met for decades is meritless, especially because, ██████████████████████████ Steinhardt further knew both that the Met was ██ ██████ returning the looted Lydian Hoard to Turkey after years of a very public and contentious litigation, and of the Met's own, acknowledged history of purposefully dealing with known looters of antiquities.

Holding that unclean hands bars the assertion of a laches defense, this Court has explained that "[a] court may decline to exercise its equitable powers in favor of a party whose 'unconscionable act . . . has immediate and necessary relation to the matter that he seeks in respect of the matter in litigation.'"  *Aris-Isotoner Gloves*, 792 F. Supp. at 969-70 (quoting *Keystone*

*Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245 (1933)), *aff'd*, 983 F.2d 1048 (2d Cir.

1992).  *See generally PenneCom B.V. v. Merrill Lynch & Co.*, 372 F.3d 488, 493 (2d Cir. 2004).

In a more recent replevin and conversion case brought to recover Holocaust-looted paintings from

their current Museum possessors, this Court held that simply the fact that the Museums "had

reasons to know that the [p]aintings were misappropriated" can form the basis for barring the

invocation of laches "by the doctrine of 'unclean hands.'"  *Schoeps v. Museum of Modern Art*, 594

F. Supp. 2d 461, 468 (S.D.N.Y. 2009).

      In this case, even worse than having reason to know that the Idol was stolen from Turkey

when he acquired it, Steinhardt insists that he did not care and would avoid even looking into the

provenance of any antiquity and ignore foreign ownership laws like Turkey's as long as the

property he wants to acquire is aesthetically pleasing to him.  He admits purchasing antiquities that

were "fresh from the ground," having decided that foreign ownership laws are simply inapplicable

in the United States, and to him.  This is especially unconscionable considering that the New York

courts are particularly sensitive to this State being a haven for "illicit trafficking in stolen art."

*Lubell*, 77 N.Y.2d at 320.  Steinhardt seems to take pride in participating in such trafficking, since

his "overwhelming motivation in buying ancient art was their aesthetics."  Thus, his own files

reflect that ███████████████████████████████████.  It is not surprising that, by his

own admission, ██████████████████████████████████████████████████████

██████████████████████████████ ████████████████, dating almost to the time

Steinhardt acquired the Idol, ████████ objects have been seized from him ████████████

████████ and/or ordered forfeit by federal or state authorities. (*See generally* Motion *In Limine*)

      In light of this unconscionable conduct, his repeated acquisitions of other unprovenanced

foreign antiquities, which corroborate his admissions regarding his methods, Steinhardt also

should not be permitted to argue that Turkey unreasonably delayed commencing the action. After all, Steinhardt admits that anything he might have learned about the Idol's origin or true ownership would have been completely irrelevant to him. *See Pavers & Rd. Builders Dist. Council Pension Fund by Montelle v. Nico Asphalt Paving, Inc.*, 248 F. Supp. 3d 374, 380 n.3 (E.D.N.Y. 2017) ("laches defense requires Defendant to have 'lacked knowledge that the claim might be asserted against [it],'") (quoting *666 Drug, Inc. v. Tr. of 1199 SEIU Health Care Emps. Pension Fund*, 12-CV-1251, 2013 WL 4042614, at *9 (S.D.N.Y. Aug. 8, 2013), *aff'd*, 571 F. App'x 51 (2d Cir. 2014). To the contrary, his failure to contact Turkey before or after his acquisition to make any inquiry was deliberate, and severely prejudiced the Republic's ability to learn of and reclaim this looted property. Remarkably, Christie's had the same attitude toward Turkey's ownership law as Steinhardt: Bernheimer, the head of Christie's Antiquities Department, its Rule 30(b)(6) witness, testified that, contrary to Christie's own protocols, he unilaterally decided that Turkey's ownership law did not have to be applied in the United States, and he also did nothing to advise Turkey of the upcoming auction of what was clearly an Anatolian object, the origin of which he actually tried at different times to disguise or conceal.

A summary of the key portions of Steinhardt's damaging testimony is set forth above. In addition, the other evidence set forth above demonstrates without question that in light of the widespread publicity surrounding Turkey's efforts to reclaim its property as well as Steinhardt's close and continuing involvement with the Met when it was defending against Turkey's claim for the Lydian Hoard, all around the time that Steinhardt nevertheless acquired the Idol, there is no doubt that Steinhardt "had reason[] to know" that the Idol had been misappropriated and just did not care; thus the laches defense should be barred on that basis as well. *See Schoeps,* 594 F. Supp. 2d at 468.

Christie's also has unclean hands.  By permitting Steinhardt to consign the Idol for auction while deliberately attempting to conceal its origins from Turkey and violating its internal protocols for selling antiquities in the process, Christie's colluded with Steinhardt to conceal the Idol's origins in modern-day Turkey.  Its failure to acknowledge Turkey's right to the Idol or at least to probe more deeply or take reasonable steps to inquire into the Idol's pedigree in the face of its conspicuously spare provenance, choosing instead to rely for its diligence on the fact that it had been displayed at the Met for a long time, similarly facilitated Steinhardt efforts to avoid a claim by Turkey to an important piece of its national patrimony.  The Met was well-known, especially within the world of antiquities as the longtime home of the Lydian Hoard, another looted Turkish treasure.  These acts, together with the further fact that Christie's refused to acknowledge that Turkey's national patrimony laws apply in the United States all demonstrate that Christie's has unclean hands and cannot assert laches as a defense to Turkey's claim.

But even if the evidence of unclean hands were not so crystal clear, Defendants' laches defense would fail on other grounds as well.  First, based on Dr. Brodie's expert testimony, Defendants will be unable to demonstrate that Turkey unreasonably delayed making a claim to recover the Idol.  As Dr. Brodie explains in detail (*supra* at 11-13), the only realistic time that Turkey could reasonably have been expected to have discovered the Idol to be looted property was at the Auction with its first-time publication of the Idol's suspiciously limited provenance, and Turkey's subsequent research into its origin.

This is especially so when, as both Acting Director Boz and Dr. Brodie will testify, one considers the sheer number of looted antiquities with which Turkey must contend, especially those taken from previously unknown sites and not inventoried collections.  With limited resources, Turkey is responsible for trying to protect all of the objects created over millennia that lie buried

36

within its borders.  Despite these difficulties, Turkey's successful efforts at recovering its looted antiquities stand out in the international community.  The reasonableness and timeliness of the Republic's efforts must be judged in this context, including that it did not learn of the Idol's existence, and could not have known it had been looted, until it was "poke[d]… in the eye" for the first time by a suspiciously spare provenance at the time of the Christie's Auction in 2017. *Sotheby's, Inc. v. Shene*, 2009 WL 762697, at \*4 (S.D.N.Y. March 23, 2009) (defendant "has demonstrated that it diligently pursued claims for other objects that it believed had been stolen, . . . and there was no reason for it to be any less diligent in attempting to recover [the object] here"). *Accord: Vineberg v. Bissonnette*, 529 F. Supp. 2d 300, 309 (D.C.R.I. 2007), *aff'd*, 548 F.3d 50 (1st Cir. 2008); *In re Flamenbaum*, 22 N.Y.3d 962, 965 (2013); *Lubell*, 77 N.Y.2d at 320.

In addition to being unable to prove that Turkey was not diligent in pursuing the Idol and that they lack clean hands, Defendants will also fail to prove that they were prejudiced by the passage of time before Turkey claimed the Idol.  "The mere lapse of time, without a showing of prejudice, is insufficient to sustain a claim of laches."  *Reif v. Nagy*, 175 A.D.3d 107, 130 (1st Dep't 2019).

First, in order to avoid acquiring stolen property and thus ensure against any prejudice that could result from his purchase, Steinhardt could have contacted Alastair Martin, who was still alive at the time of Steinhardt's purchase, to check on the provenance of the Idol.  *See Reif*, 175 A.D.3d at 130 (prejudice must be shown commencing with acquisition of artwork).  Alastair Martin acquired the Idol in the early 1960s with no prior provenance whatsoever and aware of its Turkish origin, as well as the widespread publicity surrounding Turkey's then efforts to reclaim its cultural property.  He was beyond any question a serious and prodigious antiquities collector and red flags should have gone up for him and, if Steinhardt had bothered to ask Martin about it, for Steinhardt

37

as well.  But, as the evidence shows, Steinhardt had no interest in provenance and would not have cared about the problematic nature of Martin's purchase; not only because he admittedly was prepared to assume the risk of buying stolen antiquities if he liked them ████████████████, but because he believes that foreign patrimony laws should have no force or effect in the United States or to him as a U.S. citizen.

Even if Martin were still alive today, his testimony regarding his purchase could not have helped Steinhardt to establish that Martin, and hence Steinhardt, had good title to the Idol.  The Idol was stolen property under Turkish law – the uncontroverted circumstances of Martin's acquisition establish that beyond peradventure – and therefore neither of them could have gained good title to it. *See Flamenbaum*, 22 N.Y.3d at 965 (holding that a witness's death does not demonstrate prejudice to support a laches defense if the decedent's testimony could not have shown that he had proper title to the antiquity); *see also Mason v. Jamie Music Pub. Co.*, 658 F. Supp. 2d 571, 588 (S.D.N.Y. 2009) (rejecting laches defense and claim of prejudice based on inability to present deceased witness's testimony where "testimony would not change the Court's decision").  As this Court has held, only Turkish law governs the question of whether Turkey has a property interest in the Idol.  (Opinion and Order at 11)

Moreover, when he acquired the Idol, Steinhardt should have been well-aware that the Idol had been found in Turkey and should have known of the general problem of the theft and smuggling of Turkish antiquities, which was then widely known in the New York antiquities community.  He admits that he was particularly knowledgeable about ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███. Ignoring all this, Steinhardt instead went ahead with his acquisition of the Idol, despite its conspicuously spare provenance, without contacting Turkey or otherwise doing anything to avoid purchasing stolen property.  Any prejudice that might have resulted (none of which Defendants will be able to show) is clearly of his own making.  Given his acknowledged tolerance for risk, Steinhardt got precisely what he bargained for.

Similarly, Christie's cannot claim it suffered any prejudice by offering the Idol for auction. First, it is in no worse position than it was at the time it decided to auction this problematic property.  Also, it was well-aware that the Idol came from Anatolia and had no provenance before the 1960s and, as a major international auction house, it certainly was knowledgeable that Turkey was a particular victim of a vast amount of widely-publicized looting and smuggling.

Finally, besides being unable to prove the other elements of laches, the evidence presented at trial will show that Defendants cannot demonstrate that the balance of equities favors Defendants over Plaintiff.  *Pavers*, 248 F. Supp. 3d at 380 n.3 ("A laches defense requires the Court to balance the equities. . ."); *accord 666 Drug*, 2013 WL 4042614, at *10 (". . . Melrose's own conduct in availing itself of the benefits of the Fund for years while paying into the Fund at the long-expired rate . . . undermines its bid for equitable relief such as laches.").  New York law has long held that in determining the defense of laches, the degree of the defendant's vigilance when acquiring the property is as much in issue as the plaintiff's diligence in commencing the action.  *Lubell*, 153 A.D.2d at 152, *aff'd*, 77 N.Y.2d 311; *see generally Portrait of Wally*, 2002 WL 553532, at *22 (laches determinations "involve a fact-intensive inquiry into the conduct and background of both parties in order to determine the relative equities").  Moreover, defendants like Steinhardt and Christie's, with vast knowledge and experience in the art trade, are held to a higher degree of inquiry.  *Cf., e.g., Brown v. Mitchell-Innes & Nash, Inc.*, 2009 WL 1108526, at *5

(S.D.N.Y. April 24, 2009); *Deweldon, Ltd. v. McKean*, 125 F.3d 24, 27-28 (1st Cir. 1997) (art merchants and collectors with large collections are held to a higher standard of inquiry). According to his deposition testimony, although he is a sophisticated and wildly successful businessman who started collecting antiquities in the late 1980s, and has amassed a collection of hundreds of objects – with art and antiquities comprising 60% of his enormous wealth – Michael Steinhardt exercised no caution when he acquired this extremely rare and valuable Idol, and heedlessly followed his practice of ignoring provenance in favor of acquiring anything that he finds aesthetically pleasing to him, especially when ███████████. His attempt to suggest, in his direct trial testimony declaration, that Martin's ownership and the Met's possession on loan were enough provenance for him, shows very clearly how little inquiry Steinhardt was interested in doing.

Christie's also exercised no vigilance when it agreed to offer the Idol at auction. As set forth above, it did not even follow its own rules regarding the sale of antiquities. Max Bernheimer, Christie's Rule 30(b)(6) witness, testified at deposition that in its internal Policy on Cultural Property, Christie's lists 1906 as the "Sensitive Date" for Turkey as a result of its "Local Legislation." The Policy was in effect at the time the Idol was offered for sale at Christie's. Christie's was required by the Policy to demonstrate with "verifiable information" that the Idol was outside of Turkey before 1906, and if it could not do so, refer the matter to its Cultural Property Committee. Christie's was not able to demonstrate by reference to verifiable documentation that the Idol was outside of Turkey before 1906, but it nevertheless did not refer to the Cultural Property Committee, and did not try to contact the Republic, and went ahead with the Auction without regard for the questions raised by the Idol's lack of provenance before the early 1960s. Christie's also changed its drafts of the information contained in its auction catalogue and other documents to remove the word "Turkey," in an obvious attempt to obscure the origin of the Idol so as not to

40

risk informing Turkey.  As Christie's Max Bernheimer explained, "I would remove 'from Turkey'[.] Why poke them in the eye?"

Now, in his direct testimony, Bernheimer claims that the "sensitive date" is only one that "a country may argue should be considered as the date by which objects must be out of the country in order for good title to be exchanged" but that Christie's "does not necessarily agree." This brazen attempt by Bernheimer to contradict his prior deposition testimony and the express terms of Christie's policy demonstrates even more clearly his and Christie's unclean hands in this matter. Bernheimer digs an even deeper hole for himself when he now argues that Christie's can ignore the local legislation of a country like Turkey and decide that the appropriate date is an arbitrary one – 1970 – having nothing to do with Turkey's own laws.  The fact remains that Bernheimer somehow never had anyone at Christie's check with Turkey to see if Turkey indeed would "argue" that 1906 was the date of its effective legislation concerning antiquities and took affirmative steps to conceal Turkey's right to claim its ownership interest in the Idol.

In sum, the opposing parties in this case have vastly different attitudes concerning the importance and legal obligation of returning cultural property to Turkey, the country in which the Idol was discovered and from which it was unlawfully removed.  Turkey has been recognized as a leader among nations around the world in pursuing the return of cultural property looted from its territory.  Steinhardt, however, does not recognize Turkey's rights to reclaim its property and instead believes that he has no obligation whatsoever to investigate the provenance of antiquities that he has decided to acquire, even if they have been "freshly" and illegally excavated from countries that have patrimony laws like Turkey.  And Christie's has aided his conduct by accepting the Idol for consignment despite its admitted knowledge that it originated from Turkey and that Turkey had a patrimony law dating from 1906, and its express internal policy to investigate

41

patrimony laws like Turkey's 1906 Decree to ensure that it avoids offering for auction looted cultural property, as it did in this case.  And both Steinhardt and Christie's have attracted the attention of law enforcement authorities for their apparent engagement in trafficking in looted property.

## **CONCLUSION**

For the foregoing reasons, Plaintiff's requests for relief should be granted in their entirety.

Dated: New York, New York
      April 24, 2020

                       HERRICK, FEINSTEIN LLP

                       By s/ Lawrence M. Kaye_____
                            Lawrence M. Kaye
                            Victor J. Rocco
                            Howard N. Spiegler
                       2 Park Avenue
                       New York, New York 10016
                       (212) 592-1400
                       lkaye@herrick.com
                       vrocco@herrick.com
                       hspiegler@herrick.com

                       *Attorneys for Plaintiff Republic of Turkey*